MONROE, Judge.
This appeal follows entry of a judgment based on the directed verdicts entered in favor of the defendants, Trambeam Corporation, Burnett Equipment, Inc., and Hoist Services Industries (HSI).
Mueller Company operates a foundry where it produces fire hydrants. On July 20, 1992, hanger bolts supporting one of Mueller’s overhead cranes fractured, causing the crane to collapse. The fall damaged the production facility and caused a loss of production until the damage was repaired. Industrial Risk Insurers, Mueller’s insurer, paid Mueller $810,000 for the damage and seeks subrogation for that amount.
Mueller and Industrial Risk (hereinafter together referred to as Mueller) sued Tram-beam, Burnett, Whiting Corporation, Republic Engineered Steel Company, and LTV Steels, Inc. under the Alabama Extended Manufacturer’s Liability Doctrine (AEMLD), alleging that the defendants had been negligent in the manufacture, design, distribution, selling and/or installation of the hanger bolts. Mueller sued HSI, seeking damages for breach of contract, fraud, and negligence related to maintenance work that HSI had performed on the crane system before the collapse.
Upon the motions of Whiting, Republic, and LTV Steel, the trial court entered summary judgments in their favor. Mueller has not appealed those summary judgments. The case proceeded to trial on the claims against the remaining defendants. At the close of the plaintiffs’ case, Trambeam, Burnett, and HSI moved for a directed verdict.[1] The trial court granted HSI’s motion and denied Trambeam and Burnett’s motion. At the close of all the evidence, Trambeam and Burnett renewed their motion for a directed verdict. The trial court granted the motion. Mueller appealed to the Supreme Court, which deflected the case to this court pursuant to § 12-2-7(6), Ala.Code 1975.
The standard of review applicable to a directed verdict requires us to determine whether the nonmovant presented sufficient evidence to allow submission of the case to the jury for a factual resolution. Key v. Maytag Corp., 671 So.2d 96 (Ala.Civ.App.1995). A directed verdict is proper when the nonmovant has failed to present substantial evidence of one or more elements of his claim. Bell v. Sugarwood Homes, Inc., 619 So.2d 1298 (Ala.1993). Substantial evidence is “evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.” West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). When reviewing a motion for a directed verdict, this court must view the evidence in a light most favorable to the nonmovant. Carter v. Henderson, 598 So.2d 1350 (Ala.1992).
Mueller argues that it produced substantial evidence in support of each element of its claims and thus that the claims should have been submitted to the jury. Mueller contends that the trial court improperly determined that its claim against Burnett' and Trambeam was barred by the applicable statute of limitations, and, that, therefore, the trial court improperly directed a verdict in their favor. The trial court did not state the basis for its directed verdict.
A claim governed by the statute of limitations found in § 6-2-38, Ala.Code 1975, accrues when the plaintiff is entitled to maintain the action; i.e., “at the time of the first legal injury, regardless of whether the full amount of damages is apparent.” Long v. Jefferson County, 623 So.2d 1130, 1137 (Ala.1993). See also, Rumford v. Valley Pest Control, Inc., 629 So.2d 623 (Ala.1993).
Burnett and Trambeam contend that Mueller’s AEMLD claim accrued in 1985 or 1986 when bolts fractured at the same location where they had broken in 1992; therefore, they argue, the two-year limitations period expired in 1987 or 1988. We reject that argument because the evidence shows that the bolts that broke in 1985 or 1986 were replaced by Trambeam bolts supplied by Burnett. The new bolts broke in 1992 and caused the crane to collapse. Thus, the AEMLD claim as to the replacement bolts *1383 accrued in 1992, and this action, filed in July 1993, was timely. Therefore, a directed verdict based on the statute of limitations would have been improper.
Burnett and Trambeam also argue that, even if the action was filed within the limitations period, the directed verdict was still proper because, it argues, Mueller failed to produce substantial evidence in support of its AEMLD claim. To prove a claim under AEMLD, a plaintiff must prove:
“[H]e suffered injury or damages to himself or his property by one who sold a product in a defective condition unreasonably dangerous to the plaintiff as the ultimate user or consumer, if
“(a) the seller was engaged in the business of selling such a product, and
“(b) it was expected to, and did, reach the user or consumer without substantial change in the condition in which it was sold.”
Key v. Maytag Corp., 671 So.2d 96 (Ala.Civ.App.1995) (quoting Atkins v. American Motors Corp., 335 So.2d 134 (Ala.1976)).
This legal standard has been interpreted to mean that a defendant will be liable if it manufactures, designs, or sells an unreasonably dangerous product that reaches the consumer substantially unaltered, and which, when put to its intended use, caused injury. Beam v. Tramco, Inc., 655 So.2d 979 (Ala.1995). “Under the AEMLD, therefore, a defective product is one that is unreasonably dangerous, i.e., one that is not fit for its intended purpose or that does not meet the reasonable expectations of the ordinary consumer.” Id. at 981 (citations omitted). The plaintiff has the burden of proving that the product was defective and/or unreasonably dangerous when it left the hands of the seller. Jordan v. General Motors Corp., 581 So.2d 835 (Ala.1991).
The evidence relevant to this issue is as follows: Trambeam manufactured the cranes used at Mueller’s facility; Burnett, a distributor of Trambeam equipment, sold the cranes to Mueller. The crane system consists of a 3.5-ton crane and a 5-ton crane. The 5-ton crane was purchased after the 3.5-ton crane, and was attached to the same support system, which consisted of hangers connected by bolts to a track or runway. At that time, two spacers were purchased to place between the cranes to allow both cranes to operate without overloading the runways. The cranes went into operation in 1976. During the foundry’s operation, hanger rods broke periodically. Allen Walker, a general foreman at Mueller, testified that in 1985 or 1986, two hanger rods broke at the same point where the fracture occurred in 1992. Those rods were replaced with rods produced by Trambeam and sold by Burnett. At the time of the collapse, only the 3.5-ton crane was being used in production, or cyclical loading. The 5-ton crane was being used as a maintenance crane and was not operated during production.
The basis of Mueller’s claim against Burnett and Trambeam is that the 3/4-inch hanger rods that Burnett supplied to support the cranes were undersized for the function for which they were intended. Mueller contends that Burnett knew that both cranes were being operated on the same support system and that 1 1/8-inch rods should have been used to provide adequate support for both cranes. It is undisputed that Burnett decided what size bolts should be used. Joe Burnett, an officer of Burnett Equipment Company, testified that when he sold the 5-ton crane to Mueller he knew that the two cranes would operate on the same runway. He agreed that, at that time, he determined that the 3/4-inch bolts were sufficient for one crane. Burtram Miller, vice president of Trambeam, testified that when the cranes were sold he knew that they would run on the same runway. He stated that he believed that 3/4-inch bolts would be adequate to support the cranes if the spacer were installed. However, his testimony was contradicted by his deposition testimony, wherein he stated that he believed that the 3/4-inch bolts would not be adequate to support two cranes on one system. He also testified that the specifications of equipment were generally left up to the distributor.
Mueller does not contend that the hanger bolts were defective in design or in manufacture. Rather, it argues that the bolts, as used, were inherently dangerous. Thus, the *1384 claim appears to be negligence in distribution of the bolts. Roger Dean Harris, a consulting engineer and Mueller’s expert witness, testified that he conducted fatigue analysis of the bolts and that he determined that if both cranes were operated at full capacity, the bolts could be expected to eventually fracture. He testified that he determined that the bolts were likely to fracture with the 3.5-ton crane operating frequently and the 5-ton crane operating periodically. He stated that he never took the presence of a spacer bar into account when making his calculations, but that, in his opinion, the addition of a spacer bar would not affect the load capacities and that the bolts still would have fractured with a spacer bar present. He testified that 1 1/8-inch bolts would not have fractured under full-capacity operation. He stated that it was his opinion that the bolts failed because they were overloaded, i.e., that they were too small to support both of the cranes.
Bruce Montgomery, a structural engineer, testified on behalf of Burnett. He calculated the capacity of the bolts and determined that the 3/4-inch bolts were adequate to support both cranes operating at full capacity with a spacer in use. He also stated that the absence of the spacer would produce a greater load than the bolts could hold.
Conflicting testimony was presented regarding whether the spacers were present at the time of the collapse and whether “sway bracing” was in place to prevent the support system from bending and placing extra tension on the bolts. Some of Mueller’s employees testified that sometimes the maintenance crew would use the 5-ton crane to pry spilled metal from the floor. Both experts agreed that that practice could overload and weaken the rods, shortening the life of the rods. This testimony was apparently presented in support of Burnett and Trambeam’s defenses of misuse and lack of proximate cause.
Whether a product is “unreasonably dangerous” is generally a question for resolution by the trier of fact. Yamaha Motor Co., Ltd. v. Thornton, 579 So.2d 619 (Ala.1991). Furthermore, the defense of contributory negligence by use of a product in a manner not intended by the manufacturer is an affirmative defense, which the defendant has the burden of proving. Goree v. Winnebago Industries, Inc., 958 F.2d 1537 (11th Cir.1992). Based on the conflicting testimony regarding the suitability of the hanger bolts for the purpose intended by Mueller and known by Burnett and Trambeam, and regarding the alleged misuse by Mueller, we hold that genuine issues of material facts were in dispute, requiring resolution by the jury. Thus, the trial court erred when it directed a verdict in favor of the defendants on Mueller’s AEMLD claim.
Regarding the claim against HSI, Mueller argues that, pursuant to a contract entered into in 1990, HSI had a duty to inspect the runway — the support area where the bolts fractured — and to notify Mueller that an independent restraining device was needed to provide additional support for the crane. The evidence adduced at trial indicated that, in 1989, Mueller solicited bids for the renovation of its 3.5-ton crane. HSI submitted the bid that was accepted. The bid stated, in part:
“Upon receipt of a purchase order, HSI will perform a thorough inspection of the bridge crane and runway system.... As all electrical components are to be replaced, this inspection will be of mechanical functions only, and a report of our findings and recommendations will be presented to Mueller Company as a guideline.”
Mueller contends that this bid placed upon HSI a duty to perform an inspection and to inform Mueller of what modifications, if any, were needed to bring the crane system into compliance with the American National Standard for Safety Requirements for Melting and Pouring of Metals in the Metalcast-ing Industry (ANSI) Z241.2. ANSI states that “an independent restraining means shall be provided to minimize the drop of the monorail track or crane runway in the event of failure of a track hanger or bolt.” Thus, Mueller argues, had HSI properly performed the inspection and satisfied its duty to inform Mueller of the need for the restraint, the damage caused by the fracture of the bolts could have been minimized or avoided. Mueller does not contend that HSI *1385 had a duty to install a restraining device, but only that it had a duty to inform Mueller that an additional restraint was needed. Mueller also asserts that ANSI applied to the work performed by HSI by virtue of a portion of ANSI that states: “It shall be the responsibility of any person constructing, reconstructing or modifying any equipment covered by this standard to: (1) design, construct, and modify equipment in accordance with the provisions of this standard.”
HSI argues that it had no duty to inspect the support system on the runway, because the bid stated that its inspection would encompass mechanical functions only. It is undisputed that HSI did not perform any work on the runway, but that it only inspected it. It is also undisputed that ANSI is not mandatory and has no legal force, but is a generally recognized industry standard.
HSI argues that it had no duty to ensure compliance with ANSI standards except in regard to the work it performed on the hoist, as stated in its bid. HSI alleges that Mueller was responsible for implementing ANSI; indeed, ANSI specifically states that “[t]he employer shall be responsible for the installation of the equipment covered by this standard.” HSI further argues that Mueller, as the operator of a foundry to which ANSI applies, and as a member of the American Foundrymen’s Society, which promulgated ANSI, was negligent in not complying with the safety standards recommended by ANSI. It is also undisputed that Mueller had a safety director and had a copy of ANSI in its possession and that the 1981 version of ANSI recommended the independent restraining means.
Harris stated that the runway did not have any electrical components and that the bolt fracture was unrelated to the work performed by HSI; he also testified that he did not know of any equipment installed by HSI that failed to comply with ANSI.
To prove a claim of negligence, a plaintiff must prove that the defendant breached a duty owed to the plaintiff by the defendant and that the breach proximately caused damage to the plaintiff. Bowden v. E. Ray Watson Co., 587 So.2d 944 (Ala.1991). Thus, whether a duty existed is the threshold inquiry in a negligence case. Ledbetter v. United American Insurance Co., 624 So.2d 1371 (Ala.1993). The bid submitted by HSI, which the parties agree merged with Mueller’s proposal to become the contract for the renovation work, stated that the inspection would include mechanical functions only. Mueller’s expert testified that the runway contained no mechanical functions. Having reviewed the evidence presented to the trial court, we hold that the trial court properly determined that Mueller and Industrial Risk had not presented substantial evidence that HSI had a duty to inspect the runway for compliance with ANSI. Therefore, the directed verdict regarding the negligence claim was proper. Additionally, because the documents that formed the contract between Mueller and HSI did not require HSI to inspect for full compliance with ANSI, Mueller failed to produce substantial evidence that HSI had failed to comply with the contract for renovation of the crane. Thus, the directed verdict was proper as to the breach of contract claim.
The judgment is affirmed as to HSI; it is reversed as to Burnett and Trambeam; and the cause is remanded for proceedings consistent with this opinion.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
ROBERTSON, P.J., and YATES, CRAWLEY, and THOMPSON, JJ., concur.

. Mueller and Industrial Risk had withdrawn the fraud claim against HSI.