The plaintiff, Lavonda Hicks, appeals from a judgment for Vulcan Engineering Company, one of the defendants in this wrongful-death action. We affirm.
 I.
Square D Company/Anderson Products ("Square D") constructed a foundry in Leeds to produce brass electrical fittings. James Ronald Hicks, employed by Square D as a maintenance mechanic, was killed in June 1992 while performing maintenance on a molding component of the foundry system; that component was known as the "BMM Weston machine."
Hicks's widow, Lavonda Hicks, sued BMM Weston, Ltd.; Square D; and fictitious defendants, asserting claims based on the Alabama Extended Manufacturer's Liability Doctrine ("AEMLD") (see Ala. Code 1975, § 6-5-500 et seq.); breach of implied warranty; and intentional removal of, or failure to install, safety devices. Mrs. Hicks dismissed her claims against Square D, and the trial court entered a default judgment in favor of Mrs. Hicks and against BMM Weston, "with leave to prove damages at trial." By amended complaint, Mrs. Hicks substituted Vulcan Engineering Company as a defendant in place of fictitious defendant "XYZ," which had been designated in the original complaint as the manufacturer of the molding machine on which Hicks was killed. By motion to amend, Mrs. Hicks also substituted Vulcan Engineering for defendants "XYZ" and "GHI." The original complaint had designated had "GHI" as the seller of the allegedly defective product.
At the close of the plaintiff's case, the trial court granted Vulcan Engineering's motion for a judgment as a matter of law with regard to the AEMLD claims, and it reaffirmed that ruling at the close of all the evidence. The trial court charged the jury as to negligence, contributory negligence, and damages. The jury awarded Mrs. Hicks damages of $1,147,400 against the defaulting defendant BMM Weston, but found in favor of Vulcan Engineering. The court entered a judgment on that verdict. Mrs. Hicks appealed.
 I.
Mrs. Hicks argues that the judgment as a matter of law in favor of Vulcan Engineering on her AEMLD claim is erroneous because, she argues, Vulcan Engineering is liable as a "manufacturer" under the AEMLD.
 "`A judgment as a matter of law[1] is proper only where there is a complete absence of proof on a material issue or where there are no controverted questions of fact on which reasonable people could differ.' Locklear Dodge City, Inc. v. Kimbrell, 703 So.2d 303 (Ala. 1997). Further, this Court, as the reviewing court, must view all evidence in the light most favorable to the nonmoving party. Bussey v. John Deere Co., 531 So.2d 860 (Ala. 1988)."
Wal-Mart Stores, Inc. v.Thompson, 726 So.2d 651, 654 (Ala. 1998).
The evidence showed that the BMM Weston machine on which Hicks was injured was a component of the Square D foundry system. Square D purchased the BMM Weston machine directly from the manufacturer, and BMM Weston shipped it to the Square D plant in Leeds. BMM *Page 420 
Weston's contract with Square D stated that the machine was "preassembled, prepiped, and pretested" and that BMM Weston would provide:
 "1. All necessary installation, maintenance, and operating drawings and instructions.
"2. Spot supervision of normal installation.
 "3. Normal start-up service by qualified BMM Weston representative.
"4. Personnel training during normal start-up."
Vulcan Engineering, the general contractor for the foundry project, installed the BMM Weston machine and integrated it into the foundry system. Paul Creed, Vulcan Engineering's manager of engineered systems and project manager for the Square D job, stated that Vulcan Engineering prepared the concrete foundation and steel work to support the BMM Weston machine, assembled the BMM Weston machine on the foundation and integrated it into the foundry line by attaching it to a conveyor system built by Vulcan Engineering, and attached the BMM Weston machine to Square D's central electrical and pneumatic lines.
BMM Weston's on-site representative and two Square D representatives supervised Vulcan Engineering's installation of the BMM Weston machine, using drawings and specifications supplied by BMM Weston. The BMM Weston representative loaded the control program for the BMM Weston machine into the foundry line's computerized logic controller. Steve Orazine, senior engineering specialist at Square D, testified that Square D manufactured the logic controller and that the BMM Weston representative programmed it for the BMM Weston machine. Orazine also stated that the BMM Weston machine was a "self-contained" unit, but was designed to be an integral part of a foundry system and would not perform its part of a foundry operation until it was incorporated into the system. Paul Creed testified that Vulcan Engineering made no modifications to the BMM Weston machine, to the manufacturer's specified procedure for its installation and integration into the foundry system, or to its operation once it was installed.
Square D's maintenance supervisor, Charles Price, testified that BMM Weston representatives showed Square D's maintenance employees how to operate the BMM Weston machine, how to evaluate its operation for maintenance and repair, and how to perform maintenance and repairs on the machine. Price stated that he did not look to Vulcan Engineering for service or maintenance of the BMM Weston machine.
Square D required its maintenance employees to follow a lock-out/tag-out safety procedure before performing repair or maintenance on the machines at the plant. The procedure resulted in a machine's complete shutdown so that it could not be activated until the maintenance employee used his own key to unlock the machine. Hicks participated in lock-out/tag-out training on January 31, 1992. In order to perform maintenance on the BMM Weston machine, Square D maintenance workers were required to lock off the power to the machine, bleed the air from the air lines, and make sure the key switch on the machine's control console was turned from "automatic" to "manual."
Price testified that normally the machines at the Square D plant were turned off by the operators at the end of their shift each afternoon so that the machines were off when the maintenance workers began their shift at 11:00 P.M.
On the day of the accident, June 22, 1992, James Ronald Hicks and Billy Ray Newton (another Square D maintenance worker) were told to change a shock absorber on the BMM Weston machine. Price, who was Hicks and Newton's supervisor, testified that he asked Hicks if he had the BMM Weston machine "powered down and locked off," and that Hicks answered *Page 421 
that he did. Hicks and Newton removed a yellow-pipe guardrail so that Newton could remove the old shock absorber and install a new one. Newton testified that when he and Hicks had difficulty in replacing the screws into the newly installed shock absorber, they decided to "air up" that portion of the machine, so as to make it possible to move an arm of the machine and provide easier access to the shock absorber.
Newton testified that he left Hicks at the machine, went to the control console, and hit the "reset" button for the BMM Weston machine. Newton did not know that Hicks had climbed into the machine. When Newton returned, he found that Hicks had been caught and crushed by an arm of the machine. Newton and other maintenance workers called for help and extricated Hicks from the machine; however, Hicks died from the injuries he had sustained.
According to Mrs. Hicks's expert witness, mechanical engineer Calvin Rush McClinton, the Square D foundry system normally operated in automatic mode, but could be operated in manual mode for maintenance purposes. After Hicks's accident, it was discovered that during the first 45 seconds after the system's automatic mode was initiated, the parts of the BMM Weston machine could be moved manually. In other words, the BMM Weston machineappeared to be in manual mode during the first 45 seconds of being in automatic mode. At the end of the 45-second delay, the system began to move and operate in automatic mode, and any part of the BMM Weston machine that had been manually moved out of place returned to its "home position."
McClinton testified that, in his opinion, the 45-second delay was not a good practice and that there should have been an audible warning device to alert workers that the system was in automatic mode and was going to begin moving and operating. McClinton also stated that it was his opinion that the 45-second delay made the BMM Weston machine unreasonably dangerous. McClinton read, from national safety standards for conveyor systems, statements indicating that an alarm and a lock-out/tag-out procedure were required. McClinton also stated that it was his opinion that when a foundry system is built, safety is ensured by the joint efforts of the designers of the components, the purchaser/owner, and the general contractor.
Keith Columbo, a system safety engineer, also testified as an expert for Mrs. Hicks. Columbo stated that it was his opinion that it was a good engineering practice for the different engineers on an integrated project, such as the Square D foundry, to communicate and understand the workings of each other's systems. Both Columbo and McClinton acknowledged that, according to the BMM Weston machine operator's manual, it was anticipated by BMM Weston that workers would enter the BMM Weston machine to perform maintenance and repair, but they stated that it was not a good safety practice to do this when the BMM Weston machine was "on."
Columbo testified that the manufacturer's manual for the BMM Weston machine clearly stated that one could not manually override the control of the BMM Weston machine when the machine was in automatic mode. Therefore, concluded Columbo, when Hicks was able to move the arm of the BMM Weston machine, he naturally assumed that the machine was in manual mode, even though it had been placed back into automatic mode and the 45-second delay was in effect. Columbo also stated that the national safety standard for conveyors required a warning device and a lock-out/tag-out procedure for the BMM Weston machine, and that, in his opinion, the BMM Weston machine at the Square D plant, which did not have its own warning device or lock-out/tag-out procedure, was unreasonably dangerous.
Creed, McClinton, and Columbo all testified that Vulcan Engineering, as the general *Page 422 
engineering contractor for the Square D job, was responsible for integrating all of the parts of the foundry line so as to produce a functioning system that worked as a whole.
Vulcan Engineering's expert witness, Mike Burleson, stated that the BMM Weston machine was not a conveyor system, but was a casting foundry. Therefore, stated Burleson, the national standard for foundry safety applied, and that standard, he said, does not require a warning device and lock-out/tag-out procedure. Burleson also testified that it was his opinion that the 45-second delay was not a dangerous defect.
While Vulcan Engineering was acting as general engineering contractor for the construction of the Square D foundry, its duties included the manufacture of ancillary parts for other components of the foundry system. Vulcan Engineering's contract with Square D required Vulcan Engineering to produce a working foundry. Vulcan Engineering designed and manufactured the conveyor system that was attached to the BMM Weston machine and carried the finished molds away from the machine, and Vulcan Engineering installed safety features such as a breaker box to lock out the entire system, the yellow-pipe guardrail, and a sign that read "Warning: This machine starts automatically."
Mrs. Hicks argues that the evidence shows that Vulcan Engineering was the manufacturer of the ultimate product — a complete, working foundry; that Vulcan Engineering delivered the product to Square D; that the product was unreasonably dangerous as delivered; and that Vulcan Engineering created the unreasonable risk of harm inherent in the product.
Vulcan Engineering points out, however, that the plaintiff presented no evidence indicating that any portion of the foundry system manufactured by Vulcan Engineering is defective. The alleged defect — the 45-second delay in the BMM Weston machine's beginning to operate in automatic mode — is not "traceable" to Vulcan Engineering because 1) Vulcan Engineering did not manufacture the BMM Weston machine; 2) Vulcan Engineering was not required to know the inner workings of the BMM Weston machine; and 3) Vulcan Engineering did not program the computer that controlled the BMM Weston machine. Mrs. Hicks's claims, says Vulcan Engineering, are based solely on Vulcan Engineering's attaching the BMM Weston machine to the Square D foundry line. Vulcan Engineering maintains that it was hired to produce a foundry system and that it incorporated the BMM Weston machine, unmodified, into that system and attached it to a conveyor to carry away the finished mold. Thus, says Vulcan Engineering, it did not manufacturer a defective product and the judgment as a matter of law in its favor was proper.
 "Under the AEMLD, a manufacturer, supplier, or seller who markets a product not reasonably safe when applied to its intended use in the usual and customary manner, is negligent as a matter of law. In other words, the fault or negligence of the defendant is that he has conducted himself in a negligent manner by placing on the market a product that causes personal injuries or property damage when put to its intended use. As long as there is a causal relationship between the defendant's conduct and the defective product, liability may attach, because an unreasonable risk of harm has been created. Liability — subject to allowable defenses (e.g., lack of causal relation, contributory negligence, assumption of the risk) — attaches solely because the defendant has exposed users of a product to unreasonable risks. Casrell v. Altec Industries, Inc., 335 So.2d 128 (Ala. 1976); Atkins v. American Motors Corp., 335 So.2d 134 (Ala. 1976)."
Entrekin v. Atlantic RichfieldCo., 519 So.2d 447, 449 (Ala. 1987). *Page 423 
At the close of the plaintiff's case, the trial court held a hearing outside the presence of the jury to consider Vulcan Engineering's motion for a judgment as a matter of law. In granting the motion as to Mrs. Hicks's AEMLD claim against Vulcan Engineering, the trial court stated:
 "Question number one, did Vulcan [Engineering] design this piece of equipment that killed this man? The answer is clearly `no.' Number two, did Vulcan [Engineering] sell the piece of equipment that killed this man? The answer is obviously `no.' Did Vulcan [Engineering] manufacture the piece of equipment that killed this man? The answer is, `No, BMM Weston manufactured the equipment.' And if all of those answers are `no,' then how can Vulcan [Engineering] be liable under the Alabama Extended Manufacturer's Liability Doctrine for the death of the decedent? . . . I am going to let [the negligence count] go to the jury. But I have got a real doubt about sending the products liability theory to the jury. . . .
 "Here, BMM Weston manufactured the closing machine . . . and manufactured its operating unit, and was there to make sure it was operated and installed properly. . . . [H]ow can [BMM Weston] not be the only manufacturer of that piece of equipment? I just don't see how anybody else could be held to be the manufacturer. And [BMM Weston] certainly was the one that designed it under their contract, and they are certainly the ones that sold it. . . .
 "I am going to grant [Vulcan Engineering's motion for a judgment as a matter of law] as to the Alabama Extended Manufacturer's Liability Doctrine and deny it in all other respects, which means that we are going to be . . . submitting to the jury issues of negligence, contributory negligence, and damages."
Mrs. Hicks contends, however, that this Court's decision inForemost Insurance Co. v.Indies House, Inc., 602 So.2d 380 (Ala. 1992), requires a reversal of the judgment for Vulcan Engineering on the AEMLD claim. In Foremost, a mobile home was destroyed by a fire that was caused by a defective refrigerator that had been installed in the home by the mobile home manufacturer, Indies House. Foremost, the insurer of the mobile home, sued Indies House, and the trial court granted Indies House's motion for summary judgment. On appeal, this Court affirmed the judgment with respect to all claims except an AEMLD claim:
 "The pivotal question in this case is: Was Indies House merely a distributor of a finished product, i.e., the refrigerator, or is Indies House deemed to be the manufacturer of the entire mobile home, including the refrigerator incorporated into it by Indies House?
 "We conclude that, for purposes of the applicability of the causal relation defense [asserted by Indies House in response to the AEMLD claim], Indies House is deemed a manufacturer. When Indies House combined a finished product with other materials to create a mobile home, it was the manufacturer of the mobile home, in toto. This is true even though the refrigerator incorporated therein was structurally unaltered. Indies House did not `distribute' an unaltered refrigerator. Indies House manufactured a mobile home, a component of which was an unaltered refrigerator."
602 So.2d at 382.
Mrs. Hicks argues that Vulcan Engineering is in a position similar to the position Indies House was in — that Vulcan Engineering "did not `distribute' an unaltered [BMM Weston machine]," but that [Vulcan Engineering] manufactured a [foundry system], a component of which was an unaltered [BMM Weston machine]." According to Mrs. Hicks, "[w]hen [Vulcan Engineering] combined a finished product with other materials to create a [foundry system], it was the manufacturer of the [foundry system],in toto." Id. We disagree. *Page 424 
In Foremost, Indies House purchased the materials and component parts (e.g., the refrigerator) it needed to manufacture a mobile home. As far as Indies House was concerned, the refrigerator was a piece of a finished product — a mobile home — that Indies House placed in the "stream of commerce."
The evidence shows that the BMM Weston machine was purchased by Square D and was delivered to Square D as a finished product. It was installed according to BMM Weston plans and specifications, under the supervision of a BMM Weston representative. Further, the BMM Weston machine became operational only after Vulcan Engineering completed the installation of the machine and after the BMM Weston representative programmed the foundry system's logic-control computer with the 45-second delay in the BMM Weston machine's automatic-mode operation.
The BMM Weston machine was not a defective part until after it was integrated into Square D's foundry and was programmed by BMM Weston with a 45-second delay sequence that made the BMM Weston machine, according to the plaintiff's experts, unreasonably dangerous. McClinton testified that it was the 45-second delay that accounted for the defect and the "unreasonably dangerous" aspect of servicing the BMM Weston machine.
In this case of first impression, and under these circumstances, to hold that Vulcan Engineering is a manufacturer would be an unsupported expansion of AEMLD liability. Therefore, we conclude that the trial court properly entered the judgment as a matter of law on the issue of Vulcan Engineering's liability as a manufacturer under the AEMLD.
 II.
Mrs. Hicks also claims that the trial court gave an erroneous instruction to the jury on the defense of contributory negligence. The trial court's charge reads:
 "It is the plaintiff's claim that Vulcan Engineering Company was negligent and that, as a proximate or direct result of that negligence, James Ronald Hicks was caused to suffer injuries from which he died. . . . Vulcan Engineering Company denies that it was guilty of negligence that proximately or directly caused the injuries which led to Mr. Hicks's death. When that denial is made, . . . the burden is with the plaintiff to reasonably satisfy you from the evidence of the truthfulness of her claim before she would be entitled to recover. . . .
 "`Negligence' is generally defined as the failure to discharge or perform a legal duty owed to another party. Under the circumstances of this case, `negligence' means the failure to exercise reasonable or ordinary care. That is, such care as a reasonably prudent engineering firm would have exercised under the same or similar circumstances. . . . The duty owed by the defendant to the plaintiff was to exercise reasonable care not to injure or damage the plaintiff. . . .
 "Vulcan Engineering Company is not the insurer, that is, it does not guarantee the safety of persons using, repairing, working in or around the brass foundry in question. The mere fact that an accident or injury occurred is no evidence of any negligence by any party, including Vulcan Engineering Company. . . .
 "The proximate cause of an injury is that cause which, in the natural and probable sequence of events, and without the intervention or coming in of some new or independent cause, produces the injury, and without which the injury would not have occurred. Stated simply, the proximate cause of an injury is the direct cause of an injury. . . .
 ". . . [T]he burden is on the plaintiff to reasonably satisfy you from the evidence that the defendant Vulcan Engineering was negligent and that such negligence *Page 425 
was the direct and proximate cause of the accident and Mr. Hicks's death.
 "As defense counsel has mentioned to you, they also have pled what we call an alternative affirmative defense. They have said, `We are not negligent.' They have also said, `Even if we were, the plaintiff is not entitled to recover because Mr. Hicks, himself, was guilty of what the law calls contributory negligence, which bars his recovery.'
 "What is contributory negligence? . . . [C]ontributory negligence is negligence on the part of the deceased that proximately contributed to [his] death. The defendant, by raising this defense, has raised what we call an affirmative defense. Therefore, the burden is upon the defendant to reasonably satisfy you from the evidence as to the truth of all of the material allegations of the defense. If you are reasonably satisfied that Mr. Hicks was guilty of contributory negligence, then the plaintiff cannot recover for any initial simple negligence of the defendant. Stated simply, contributory negligence would be a bar to a recovery in a negligence action."
The trial court's charge on contributory negligence was complete and was neither misleading nor erroneous.
The judgment of the trial court is affirmed.
AFFIRMED.
Hooper, C.J., and Maddox, Houston, See, Lyons, Brown, Johnstone, and England, JJ., concur.
[1] Formerly a directed verdict or a judgment notwithstanding the verdict. See Rule 50, Ala.R.Civ.P.