BOLIN, Justice.
DISA Industries, Inc. ("DISA"), appeals from a judgment entered on a jury verdict in favor of Gregory Bell awarding $500,000 in compensatory damages.
Procedural History
On September 25, 2012, Bell sued DISA, Union Foundry Company ("Union Foundry"), and Duca Manufacturing and Consulting, Inc. ("Duca"), as well as fictitiously named defendants, based on injuries he suffered as an employee of Union Foundry. On March 13, 2014, and January 8, 2015, Bell amended the complaint, substituting the named defendants SPX Corporation ("SPX"), ABB, Inc. ("ABB"), and Anniston Iron Works, LLC ("Anniston Iron Works"), for the fictitiously named defendants. In the second amended complaint, Bell asserted claims of negligence and wantonness and a claim under the Alabama Extended Manufacturer's Liability Doctrine ("the AEMLD") against defendants DISA, Duca, SPX, ABB, and Anniston Iron Works, as well as claims arising under the Workers' Compensation Act against his employer, Union Foundry. Bell's wife, Althea Bell, asserted a loss-of-consortium claim against the defendants.
The claims against defendants ABB, SPX, and Anniston Iron Works were subsequently dismissed without prejudice. The claims against Union Foundry were consolidated for purposes of discovery, but were subsequently bifurcated for the purpose of trial.
Both DISA and Duca filed motions for a summary judgment. After conducting a hearing, the trial court granted the motion for a summary judgment filed by Duca and denied DISA's summary-judgment motion. The case went to trial against DISA.
On August 30, 2016, in accordance with the jury's verdict, the trial court entered judgment on behalf of Bell and against DISA, awarding Bell $500,000 in compensatory damages.[1]
*145 DISA filed a motion for a judgment as a matter of law and a motion for a remittitur, both of which were denied by the trial court. On January 23, 2017, DISA filed a notice of appeal.
Facts
A. The New Molding System
Union Foundry manufactures cast-iron pipe fittings. In 2000, Union Foundry entered into a contract with Georg Fisher DISA ("GFD"), a predecessor to DISA, for the purchase and installation of a "New GFD Molding System" at its foundry. Under the "Terms and Conditions" section of the contract, DISA set forth the following limitations, in pertinent part:
"8. Scope Limitations
"a. [DISA] reserves the right to make design, construction, and procurement decisions based on least cost, unless certain manufacturers, designs or methods are specifically provided for in writing in this Contract.
"b. Any equipment, structure or service item that is not included in writing in this Contract is hereby specifically excluded from the Scope of this Contract.
"c. [DISA] shall only be responsible for those items set forth as [DISA's] responsible [sic] in this Contract."
In its proposal, which subsequently became part of the contract, DISA listed the specific costs for the "Union Foundry New Molding System and Auxiliaries." DISA indicated the costs for "building alterations, platforms, and stairs" as $145,000, "detail and project engineering" as $310,000, "site supervision" as $150,000, and "startup assistance and commissioning" as $180,000. It also indicated that "relocat[ion] of the pouring furnace" and demolition would be "by Union." DISA indicated the total costs for the new molding system was $9,999,900.
DISA attached a "Scope of Supply" to its proposal.[2] After meeting with Union Foundry officials, DISA subsequently provided an "expanded description of the material in [its] proposal," which included a more detailed "Scope of Supply" and set forth additional duties for Union Foundry. The expanded Scope of Supply indicated that DISA would install the equipment for the molding system, including spill-sand hoppers and conveyors, a casting conveyor system, a multi-cooler, and "work platforms (upper and lower at molding machine) ... and mold line access stiles."[3] It also provided that "[a]ll equipment or fabrication supplied directly by [DISA] to be surface prepped and painted GFD blue. All other manufacturer/vendor supplied with manufacturer's standard finish/colors." DISA's Scope of Supply for the electrical installation was limited to the mold-line control system and other items related to the molding machine and conveyance system, such as providing necessary conduit, wire, and labor for the molding-machine control panels and spill-sand conveyor system. DISA further limited its scope of piping to the molding-line device and sand cooler. In addition, DISA's Scope of Supply for foundation and flooring was limited to the molding machine, auxiliary devices, cooling lanes, autopour unit, sand cooler, and reinforced floors.
The proposal also listed numerous responsibilities for Union Foundry, including the relocation of the "Duca pouring furnace, *146 " "hot metal delivery," and "[a]nything not specifically listed in the proposal." However, the contract states "[DISA] to provide Duca pit in new location." The expanded agreement sets forth additional responsibilities for Union Foundry, including the following pertinent sections:
"A. Union [Foundry] will move the existing DUCA 5 ton capacity pouring furnace and service crane to the new pit after the new line is operational. Refractory replacement, power, water and control connections will be Union Foundries'[sic] responsibility. Union [Foundry] will modify the pouring spout, if necessary, to accommodate conditions of the new molding line.
"....
"C. Demolitions including modifying existing sand hoppers, sand conveyors, platforms, interior walls and removal of existing equipment [are] Union Foundry['s] responsibility.
"....
"L. Hot metal delivery, shot blast equipment and casting handling conveyors are Union Foundry responsibility."
In 1999, DISA provided initial "arrangement drawings" of the project to Union Foundry. The "drawing status" indicated that the arrangement drawings were "preliminary" and that "safety [was] given consideration in this design." Additionally, a handwritten approval note on the arrangement drawings specifically stated:
"These drawings approved as 'general concept as noted' only. This does not relieve [DISA] of design, engineering, manufacturing, construction or installation errors or flaws, omissions or inadequate performance of equipment, material or installation under [DISA's] work scope...."
The arrangement drawings included a general modification of the trough, which is where Bell was working when he was injured.
Union Foundry's engineers subsequently created more detailed drawings of the "furnace-platforms plan" that included a 24-inch modified extension of the trough. Union Foundry also created specific drawings of the "required modifications layout" and a "reference drawing" of the "pour launderer modifications," which included the 24-inch modified extension of the trough.
Before Union Foundry contracted with DISA and moved the furnace, the foundry employees referred to the area around the mid-level platform and trough as "the BMD line." After the furnace was moved and the project was completed, the employees began referring to both the mid-level platform area and the molding line as "the GFD line." The photographs of the foundry, which were taken shortly before trial, indicate that the mid-level furnace platform was painted yellow. A set of stairs leading from the mid-level platform down to the molding-line area were painted blue. At some point, the yellow letters "GFD" were affixed to the stairs, but DISA maintains that it did not affix the letters.
B. How the Furnace System and Molding Line Work
A fork truck brings large bars of metal into the foundry; they are placed on a large "ladle." A five-ton hoist moves the ladle into the furnace. The furnace heats the bars into molten iron. The furnace maintains the molten iron at approximately 2500 degrees Fahrenheit.
The furnace vessel is pressurized and has a trough, also known as a launderer, and a pour spout positioned on a mid-level platform above a conveyor system for the molding line below. The molten metal runs through the trough to the pouring spout *147 along the mid-level platform. The hot molten metal is poured from the spout into molds that run under the furnace along a conveyance system.
At least two Union Foundry employees work on platforms above the molding-line conveyance system. A furnace attendant worked on the mid-level platform by the trough. Throughout the day, the furnace attendant pours iron from a ladle into the furnace and then walks to the trough area, where the attendant uses a dipper to take samples of the molten metal to be sent to the laboratory. The attendant also provides general maintenance around the area, such as removing slag from the furnace fill hole and removing iron buildup from the pour hole. Another Union Foundry employee, the pourer, works on another platform next to the mid-level platform. The pourer uses a joystick to control the movement of the molding system as the molten metal is poured from the pour spout on the mid-level platform into the molds below.
The molding machine mixes green sand, which is a mixture of sand, clay, and water, to form molds for the molten iron. The molds are transported on a conveyance system for cooling. Another conveyance system under the molds takes away the spilled sand.
C. The Foundry Accident
Bell worked as a furnace attendant on the mid-level platform next to the trough, which had been modified by the 24-inch extension. Bell's supervisors trained him to step over the trough. Workers, including supervisors, frequently stepped over the trough to perform work on the other side of the mid-level platform. There were, however, two other ways to access the other side of the trough. One approach was to go to the end of the platform by the furnace and walk around to reach the opposite side; Bell and the other employees, however, stayed away from this part of the platform because it was too narrow and the only guarding around it was a steel wire. Another approach was to walk down the steps, cross over the trough from below the mid-level platform, and walk up the steps to the other side; Bell testified that this was not an option for him because, if he were out of position during the pouring of a new batch, he would have been "written up" for "failure to be on the job."
On September 28, 2010, Bell took a lunch break, and a relief man worked as the furnace attendant in his place. During the break, the furnace was temporarily shut down, and the relief man lit a torch to prevent the iron from hardening. At some point, the furnace restarted. The relief man, however, did not extinguish the torch.
When he returned from lunch, Bell put on his personal protective equipment, including safety glasses, a tinted face shield, a heat jacket, heat pants, chaps, heat gloves, ear plugs, and the steel-toed boots required by Union Foundry, and returned to the mid-level platform. After the relief man left, Bell noticed that the torch, which was on the other side of the platform, needed to be extinguished. As he stepped over the trough, he tripped and his boot dipped into the molten metal. The boot began melting onto his foot. Bell tried to take the boot off, but there was a knot in his shoelace. Bell hollered and the pourer pulled the boot off for him.
Bell was transported to the burn clinic at the University of Alabama at Birmingham Hospital. He underwent four surgeries, including amputation of his toes, and he remained in the hospital for 30 days. One week after the accident, Union Foundry installed a guardrail around the modified *148 trough to prevent workers from stepping over the trough.
Standard of Review
The standard of review for a ruling on a motion for a judgment as a matter of law ("JML") is as follows:
" 'When reviewing a ruling on a motion for a JML, this Court uses the same standard the trial court used initially in deciding whether to grant or deny the motion for a JML. Palm Harbor Homes, Inc. v. Crawford, 689 So.2d 3 (Ala. 1997). Regarding questions of fact, the ultimate question is whether the nonmovant has presented sufficient evidence to allow the case to be submitted to the jury for a factual resolution. Carter v. Henderson, 598 So.2d 1350 (Ala. 1992). The nonmovant must have presented substantial evidence in order to withstand a motion for a JML. See § 12-21-12, Ala. Code 1975; West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989). A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury. Carter, 598 So.2d at 1353. In reviewing a ruling on a motion for a JML, this Court views the evidence in the light most favorable to the nonmovant and entertains such reasonable inferences as the jury would have been free to draw. Id. Regarding a question of law, however, this Court indulges no presumption of correctness as to the trial court's ruling. Ricwil, Inc. v. S.L. Pappas & Co., 599 So.2d 1126 (Ala. 1992).'
" Waddell & Reed, Inc. v. United Investors Life Ins. Co., 875 So.2d 1143, 1152 (Ala. 2003)."
CSX Transp., Inc. v. Miller, 46 So.3d 434, 450-51 (Ala. 2010).
Discussion
A. AEMLD Claim
DISA argues that it was entitled to a JML because, it says, there was no legally sufficient evidentiary basis on which a reasonable jury could find in favor of Bell with regard to the AEMLD claim. Specifically, DISA contends that there is no evidence indicating that it sold, manufactured, or designed the modified trough and work platform and that the scope of its contract with Union Foundry did not include any such responsibility. It argues that Union Foundry was the actual designer of both the modified trough and the platform. DISA also maintains that the integration of its molding line with Union Foundry's furnace does not establish that it was the manufacturer of the foundry system in its entirety and that its molding line was not defective.
At trial, the Bells' theory on the AEMLD claim was that a defect in DISA's design of the modified trough-i.e., not including guardrails-caused Bell to suffer injuries he would not have otherwise suffered. Bell argues that the evidence established that DISA was the initial designer of the extension of the trough because DISA provided the arrangement drawings for the location of the furnace, the platform, and the pouring spout and its drafter certified the safety of the design. Bell maintains that the evidence established that DISA advised Union Foundry to extend the trough, which was level with the floor of the platform, by 24 inches but failed to specify that guardrails should be installed around the extension.
In addition, Bell asserts that, in the contract between DISA and Union Foundry, DISA reserved the right to formulate the design, construction, and procurement decisions. DISA, however, argues that the contract provision referencing design and *149 construction was solely for the molding line and did not include the design or construction of any part of the furnace.
Under the AEMLD, "a manufacturer, or supplier, or seller, who markets a product not reasonably safe when applied to its intended use in the usual and customary manner, constitutes negligence as a matter of law." Casrell v. Altec Indus., Inc., 335 So.2d 128, 132 (Ala. 1976).
"[A] defendant will be liable under the AEMLD if it manufactures, designs, or sells an unreasonably dangerous product that reaches the consumer substantially unaltered and, because of its unreasonably dangerous condition, injures the consumer when put to its intended use. Under the AEMLD, therefore, a defective product is one that is unreasonably dangerous, i.e., one that is not fit for its intended purpose or that does not meet the reasonable expectations of the ordinary consumer."
Beam v. Tramco, Inc., 655 So.2d 979, 981 (Ala. 1995), citing Casrell, 335 So.2d at 133, and Entrekin v. Atlantic Richfield Co., 519 So.2d 447 (Ala. 1987). Furthermore, "it makes no difference whether it is dangerous by design or defect. The important factor is whether it is safe or dangerous when the product is used as it was intended to be used." Casrell, 335 So.2d at 133.
"In an AEMLD action, 'the plaintiff must affirmatively show that the product was sold with a defect or in a defective condition.' Jordan v. General Motors Corp., 581 So.2d 835, 836-37 (Ala. 1991). 'Without evidence to support the conclusion that the product was defective and/or unreasonably dangerous when it left the hands of the seller, the burden is not sustained.' Jordan, 581 So.2d at 837. 'Proof of an accident and injury is not in itself sufficient to establish liability under the AEMLD; a defect in the product must be affirmatively shown.' Townsend v. General Motors Corp., 642 So.2d 411, 415 (Ala. 1994)."
Tanksley v. ProSoft Automation, Inc., 982 So.2d 1046, 1051 (Ala. 2007).
The first question this Court must decide is whether DISA is a "manufacturer" for purposes of the AEMLD. DISA argues that the AEMLD claim must fail because, it says, there is no evidence indicating that it was a manufacturer, assembler, designer, or seller of the trough or platform. Bell, however, argues that the evidence establishes that DISA was the designer of the 24-inch extension of the trough that ran along the floor of the platform to the pour spout.
Bell relies heavily on Hannah v. Gregg, Bland & Berry, Inc., 840 So.2d 839 (Ala. 2002), for the proposition that an engineering firm can be held liable under the AEMLD for its drawing and layout of a finished product and for supplying components that make up the finished product. In Hannah, the decedent was crushed to death between a "belt wrapper" and a "recoiler," collectively referred to as the "continuing annealing oven" ("the CAL"). In the 1960s, Westinghouse Electric Corporation had provided the electrical controls for the CAL. The plant owner had "provided Westinghouse with a full-scale layout of the control system it wanted" and "specified the types of devices that were to be included in the control stations." Hannah, 840 So.2d at 845. Westinghouse, however, drew the schematic for the sequence of operations of the CAL and supplied the control panel for the electrical controls of the CAL, as well as operator stations, motors, and the logic solenoid. On appeal, Westinghouse argued that it should not be held liable for its drawing of the control panels or control logic because neither was a "product" under the AEMLD. This Court disagreed, reasoning that "[t]he combination of the products supplied by *150 Westinghouse made up the electrical controls of the CAL; thus, Westinghouse provided more than simply a service to Reynolds." 840 So.2d at 854.
In Hannah, the plaintiffs' experts testified that, although the plant owner had designed the layout of the buttons on the control panel, Westinghouse should have suggested a different design, one that included an interlock feature to turn off power to the belt wrapper and an audible warning on its control circuitry. This Court determined that there was substantial evidence creating a genuine issue of material fact as to whether Westinghouse negligently designed the control logic and negligently manufactured the electrical controls that operated the machinery.
DISA, however, asserts that Hannah is distinguishable because in Hannah Westinghouse was the actual designer of the electrical-control system. Upon reviewing the more detailed drawings that were created by Union Foundry after DISA's initial general arrangement drawings were issued, the Bells' own expert, Dr. Igor Paul, a mechanical engineer and professor of engineering at Massachusetts Institute of Technology with at least 50 years of experience, testified that DISA was not the actual designer or manufacturer of the modified trough.
Bell, citing Foremost Insurance Co. v. Indies House, Inc., 602 So.2d 380, 382 (Ala. 1992), asserts that DISA was liable for a defective product even if another company was the manufacturer of the product, here the furnace, because DISA integrated the product into the foundry line. In Foremost Insurance, a mobile-home manufacturer was found liable under the AEMLD for a defective refrigerator it had incorporated into a finished mobile home. The refrigerator had been manufactured by another entity. When determining whether the mobile-home manufacturer was merely a distributor of the refrigerator or a manufacturer of the entire home, the Court held that Indies House, Inc., became the manufacturer of the mobile home in toto when it combined its finished product with other materials to create a mobile home. 602 So.2d at 382. Foremost Insurance, however, is distinguishable from the case before us, because it is clear that DISA did not install the modified trough or platform.
DISA argues that the integration of its molding-line system into the foundry-line system does not establish that it was responsible for guarding a hazard on the foundry line. DISA contends that a determination that a manufacturer or designer of a piece of equipment is responsible for a system as a whole merely because the equipment was connected to, or integrated with, another's system is contrary to Alabama law. DISA relies on this Court's opinion in Hicks v. Vulcan Engineering Co., 749 So.2d 417, 423 (Ala. 1999), in which the Court held that a general contractor who installed a machine completed by another company without making any modifications to the machine and without deviating from the specified procedure for installation was not a "manufacturer" under the AEMLD.
In Hicks, a maintenance mechanic employed by Square D Company, a foundry, was killed while performing maintenance on the BMM Weston machine, a molding component of the foundry system. Square D Company had purchased the machine directly from the manufacturer, BMM Weston. BMM Weston's contract with Square D provided that Square D would provide all installation instructions and normal start-up service and training and would supervise installation of the machine. Vulcan Engineering, the general contractor for the foundry project, integrated the BMM Weston machine into the foundry line by attaching it to a conveyor system built by Vulcan Engineering and *151 affixing the machine to Square D's electrical and pneumatic lines. BMM Weston's and Square D's representatives supervised Vulcan Engineering's installation of the machine, using BMM Weston's drawings and specifications. A BMM Weston representative loaded the control program for the BMM Weston machine into the foundry line's computerized controller. The Court reasoned:
"The BMM Weston machine was not a defective part until after it was integrated into Square D's foundry and was programmed by BMM Weston with a 45-second delay sequence that made the BMM Weston machine, according to the plaintiff's experts, unreasonably dangerous."
749 So.2d at 424. This Court concluded that holding that Vulcan Engineering was a manufacturer of a product under those circumstances would be an unsupported expansion of the AEMLD.
Bell asserts that Hicks, however, is distinguishable. Specifically, they argue that, unlike DISA, Vulcan Engineering did not dictate the method of installation, the specifications for the layout, or otherwise modify the machine or its operation.
DISA maintains, and the record substantially demonstrates, that it did not manufacture, design, or manage the operation of the modified trough or platform. The evidence likewise does not show that DISA sold or manufactured the modified trough to Union Foundry or that it was the designer of the new foundry system in its entirety.
Although DISA initially provided arrangement drawings that set forth the general location of the furnace and the molding line to Union Foundry, the evidence indicates that Union Foundry subsequently created more detailed drawings of the work-platform and pour-launderer modifications. Nothing in the record indicates that Union Foundry conferred with DISA about its more specific design of the modified trough. Upon reviewing all the drawings and the contract between Union Foundry and DISA, the Bells' own expert, Dr. Paul, testified that Union Foundry was the actual designer of the platform and acknowledged that Union Foundry "actually modified and designed the extended pour launderer." Thus, it is clear that the AEMLD is not applicable, because DISA was not a manufacturer, designer, or seller of the modified trough.
It should be noted that the Bells' counsel recognized the inadequacy of the AEMLD claim when he conceded during oral argument: "I think this is a negligence case, Judge, I really do. And I think we can-I think we could drop the AEMLD and go to negligence claims. I agree that they both were product manufacturers of certain aspects, but I think based on the caselaw they presented they were not a product manufacturer of the product as a whole."[4]
B. Negligence Claim
This Court now turns to the next issue, i.e., whether the Bells presented *152 substantial evidence of negligence to withstand DISA's motion for a JML. Bell asserts that DISA's supervisory role on the project created on its part a duty to inform Union Foundry of the obvious need for guardrails around the modified trough and pour spout. DISA argues that the Bells failed to prove that it had a duty to ensure that railings were installed around the trough or to warn Union Foundry that railings were necessary. Specifically, it argues that supervising the area around the modified trough was not within the scope of its contract.
To prove negligence, a plaintiff must establish: (1) a duty to a foreseeable plaintiff; (2) a breach of that duty; (3) proximate causation; and (4) damage or injury. Farr Metal, Inc. v. Hines, 738 So.2d 863 (Ala. 1999), citing Crowne Invs., Inc. v. Bryant, 638 So.2d 873 (Ala. 1994).
First, DISA argues that nothing in its contract with Union Foundry indicates that it had a duty to supervise areas outside the molding line, such as the modified trough, and, therefore, that it had no duty to warn or advise Union Foundry to install railings around the modified trough and pour spout. Upon review of the contract, which includes the Scope of Supply, it is obvious that the molding-line system was DISA's responsibility and that the furnace system, which includes the modified trough and mid-level platform, was Union Foundry's responsibility. Although the price list for the new molding system indicates that Union Foundry contracted with DISA to provide "site supervision" and "startup assistance," it is clear that the scope of DISA's supervisory duty was limited to the "new molding system."
Bell points to the Bells' engineering expert's testimony that the contract establishes that DISA supervised the operation of the furnace area, including the trough. During the cross-examination of Dr. Paul, the following exchange occurred:
"Q. All right. Do you know of any specific evidence that DISA would have even trained any Union Foundry workers about the operation of the furnace on this project?
"A. Well, they had to train them in terms of the-the line was speeded up, I forget, to about 115 per hour, which was a significant speedup, and to feed that-the molds-the furnace had to provide the increased rate of metal, so both the plaintiff up on the platform and the pourer filling the mold had to be-had to cooperate and had to be working faster than before this line.
"Q. Do you know of any piece of evidence in this case that DISA trained Union Foundry's workers on how to operate the furnace?
"A. Not how to operate the furnace. How to operate the trough and interacting with the mold.
"Q. What is the testimony that they trained any Union Foundry employee about how to operate the trough, or what is the evidence?
"A. Well, only that their contractual-saying that they would be training the personnel.
"Q. So it says in this contract that they would train Union Foundry personnel on operating the furnace or the trough?
"A. No. Operating the system.
"Q. And you don't know whether Union Foundry considers that to be a separate system-
"A. I don't.
"Q. -from the molding line?
"A. I don't."
*153 The problem with Dr. Paul's testimony regarding the extent of DISA's contractual responsibility is that it is contrary to both the evidence presented at trial and to Alabama law. "Generally, a witness, whether expert or lay, cannot give an opinion that constitutes a legal conclusion or amounts to the application of a legal definition." Hannah, 840 So.2d at 852 (citing Phillips v. Harris, 643 So.2d 974, 976 (Ala. 1994), and C. Gamble, McElroy's Alabama Evidence § 128.07 (5th ed. 1996) ). As previously discussed, the documents forming the contract indicate that the molding-line system and the furnace system are separate systems. The attachment of the molding-line system, provided by DISA, to the furnace system, alone, does not establish that DISA was responsible for the foundry system in its entirety. See Hicks, 749 So.2d at 423. The contract indicates that Union Foundry was responsible for the furnace system, including relocation of the pouring furnace, hot-metal delivery, modifications, and "anything not specifically listed in the proposal" and that DISA was responsible for the molding-line system. The contract, including the attached Scope of Supply and its expanded description, sets forth DISA's responsibilities for supervision of the "new molding line." Mike Lewis, "Vice President of Sales in North America," testified that DISA's expertise is in green-sand molding and that DISA would not have contracted to provide "either expertise or direct support on furnaces." There was no evidence presented at trial indicating that the scope of DISA's contractual duties extended beyond the molding line to the furnace system, which includes the modified trough. Moreover, although the modified trough and pour spout are on the mid-level platform just above the molding line, there is no witness testimony or other evidence indicating that DISA oversaw the work of the furnace attendant or the area around the modified trough at the start-up of the molding system.
DISA cites Mueller Co. v. Trambeam Corp., 693 So.2d 1380 (Ala. Civ. App. 1997), another foundry case, as support for its argument that it had no duty to advise or to warn that guardrails should be installed around the modified trough. In Mueller, an overhead crane system collapsed in a foundry. The foundry owner claimed that Hoist Services International ("HSI") was negligent because, the owner said, HSI had failed to properly inspect the bolts on the runway of the crane. HSI was hired only to inspect the mechanical functions of the bridge crane and runway system. HSI contended that it had no responsibility to inspect the bolts in question because its bid stated that the inspection was limited to " 'inspection ... of mechanical functions [of the crane] only.' " 693 So.2d at 1384. The foundry owner, however, argued that HSI had a duty to inform it that additional restraints were needed. The owner also argued that HSI had a responsibility to inform or report whether the crane system was in compliance with a safety provision requiring an independent restraining system to hold the crane in place in the event of a bolt failure. This Court determined that, because the runway where the bolts were located did not contain any mechanical functions designated within the limited scope of the agreement, HSI had no duty to inspect the runway for such defects. Id.
In this case, DISA had no contractual duty to inspect or to supervise any area above or beyond the molding line. Because the documents that formed the contract between Union Foundry and DISA did not establish any duty requiring DISA to inspect the modified trough, it is clear that the contract itself is insufficient to establish that DISA negligently failed to *154 advise or to warn Union Foundry to guard the area around the trough.[5]
Bell asserts that DISA's reliance on Mueller is misplaced and that this Court's decision in Hannah, supra, is more applicable. In Hannah, the plaintiff presented expert testimony that industrial general contractors had known of pinch-point defects for decades and that barrier guards would have eliminated the hazard. A safety expert testified that the general contractor should have informed the buyer of the need of a barrier guard around the machinery. As to the contractor GB & B, this Court held that a contractor is " 'not free to comply with obviously defective plans and specifications that the contractor should know may create unreasonably dangerous conditions. Rather, a contractor is expected to act reasonably under the particular circumstances in order to avoid accidents.' " Hannah, 840 So.2d at 847 (quoting Aldridge v. Valley Steel Constr., Inc., 603 So.2d 981, 984 (Ala. 1992) ). This Court found that there was a genuine issue of fact as to whether the absence of a barrier guard between the belt wrapper and the recoiler was an "obvious defect" that GB & B should have recognized and remedied. 840 So.2d at 849.
In Hannah, this Court, however, also found that the "obvious-defect" rule was not applicable to the manufacturer, Westinghouse, because it "did not simply follow plans and specifications to design the electrical control system." 840 So.2d at 856. Instead, the buyer provided Westinghouse a layout of the electrical-control system and specified the types of devices to include at the operator's stations. This Court determined that, because Westinghouse retained the ultimate control over how the finished product would perform, it had a duty to remedy the defect in the finished product to prevent foreseeable harm. 840 So.2d at 856-58.
As previously discussed, DISA did not have ultimate control over the foundry project; the scope of DISA's contract did not extend to areas beyond the molding line, which was below the mid-level platform and modified trough. In addition, there is no evidence, other than Dr. Paul's speculative testimony, indicating that DISA actually trained the furnace attendant on the modified trough and platform. This Court, therefore, cannot conclude that a DISA employee supervising the start up of the molding line on the floor of the foundry, which was below the mid-level platform where the accident occurred, should have informed Union Foundry of the need to install guardrails around Union Foundry's modified trough. We therefore conclude that the Bells failed to overcome their burden of producing substantial evidence creating a factual dispute requiring resolution by the jury. Based on the foregoing, we reverse the trial court's judgment based on the jury's verdict, and we render a judgment in favor of DISA.
REVERSED AND JUDGMENT RENDERED.
Stuart, C.J., and Main, Wise, and Sellers, JJ., concur.
Shaw, J., recuses himself.

The Court notes that a negligence claim is not subsumed by an AEMLD claim. Given that the judicially created AEMLD does not subsume a common-law action of negligence, the Court must consider the claims separately. See Vesta Fire Ins. Corp. v. Milam & Co. Constr., 901 So.2d 84 (Ala. 2004) ; Tillman v. R.J. Reynolds Tobacco Co., 871 So.2d 28, 34-35 (Ala. 2003) ; and Garrie v. Summit Treestands, LLC, 50 So.3d 458, 463-64 (Ala. Civ. App. 2010).

There is no dispute that the proposal became part of the contract between Union Foundry and DISA.

The evidentiary materials indicate that there were numerous platforms throughout the foundry. The Scope of Supply, however, was limited DISA's specific responsibility to the molding-machine platforms.

The trial court denied DISA's motion for a summary judgment without explanation. The Bells, however, did not present the AEMLD claim in their trial brief. Nonetheless, at the close of the Bells' case, counsel explained that the Bells did not concede to dismissal as to all theories under the AEMLD. Specifically, counsel argued that the AEMLD claim should proceed to the jury based, he said, on the terms of the contract between the parties and Dr. Paul's deposition testimony indicating that DISA was a designer and had supervisory responsibility over the project. The Bells' counsel did concede, however, that any argument regarding a "failure to warn" under either the AEMLD or a general negligence claim should be dismissed. The court denied the motion for a summary judgment and allowed all claims, including the AEMLD claim, to proceed.

There likewise is no evidence indicating that DISA took any affirmative steps outside its contracted duties to design, engineer, or inspect the platform and the modified trough or to supervise the furnace attendant's work on the platform. "[A] plaintiff may argue that another party has duties independent of any contract because that party has acted affirmatively." Berkel & Co. Contractors, Inc. v. Providence Hosp., 454 So.2d 496, 502 (Ala. 1984). "The existence of a collateral contract does not negate the obligation imposed in tort to act reasonably." Id.