840 So.2d 839 (2002)
Judy HANNAH, dependent widow of Jerry W. Hannah, deceased
v.
GREGG, BLAND & BERRY, INC.
Judy Hannah, dependent widow of Jerry W. Hannah, deceased
v.
Westinghouse Electric Corporation et al.
1002094 and 1002095.
Supreme Court of Alabama.
April 26, 2002.
Opinion Overruling Applications for Rehearing September 6, 2002.
*844 Steven D. Tipler and Patrick J. Ballard of Tipler Law Offices, Birmingham, for appellant.
John D. Gleissner of Rogers & Associates, Birmingham, for appellee Gregg, Bland & Berry, Inc.
James A. Harris, Jr., James A. Harris III, and G. Nicole Mapp of Harris & Harris, L.L.P., Birmingham, for appellees Westinghouse Electric Corporation; Electrical Systems Division of Westinghouse Electric Corporation; and Industrial Controls Division of Westinghouse Electric Corporation.
Amici curiae Alabama Branch of Associated General Contractors of America, Associated Builders & Contractors of Alabama, Inc., and Business Council of Alabama, in support of the application for rehearing filed by Gregg, Bland & Berry, Inc.; Matthew C. McDonald and Michael M. Shipper of Miller, Hamilton, Snider & Odom, L.L.C. Mobile.
LYONS, Justice.
Judy Hannah appeals from a summary judgment entered in favor of Gregg, Bland & Berry, Inc. ("GB & B"), and Westinghouse Electric Corporation ("Westinghouse") in a wrongful-death action. Hannah's claims are based upon the Alabama Extended Manufacturer's Liability Doctrine ("AEMLD") and theories of negligence, wantonness, and breach of warranty. We reverse and remand the summary judgment on the AEMLD and negligence claims. Hannah has not argued that the trial court erred with respect to the summary judgment on the wantonness and breach-of-warranty claims. Therefore, those issues are not before us. See Boshell v. Keith, 418 So.2d 89, 92 (1982).

I. Facts

On May 23, 1996, Jerry Hannah was crushed to death between two large industrial machines at a plant operated by Reynolds Metals Company ("Reynolds"). The machines, a "belt wrapper" and a "recoiler," were located a few feet from each other, at the end of what Reynolds referred to as the continuous annealing line ("CAL"). The belt wrapper is used to wind long sheets of aluminum as the aluminum exits an "annealing oven." The belt wrapper moves toward the recoiler to start the process of winding the aluminum into rolls.
The belt wrapper and recoiler were manufactured in the mid-1960s by the McKay Machinery Company. As originally configured, the belt wrapper operated in an overwind direction; the aluminum wrapped over the top of the belt wrapper. In 1985 or 1986, the belt wrapper was modified to wind the aluminum in an under-wind direction. In May 1996, Reynolds hired GB & B to convert the belt wrapper to its original overwind configuration.
Carlos Gregg, a professionally licensed mechanical engineer, was the president of GB & B during the conversion process. *845 GB & B reconfigured the belt wrapper in accordance with Reynolds's specifications. Reynolds's specifications did not include a barrier guard to protect persons working between the belt wrapper and the recoiler. GB & B did not suggest to Reynolds that it include a barrier guard in the specifications. When the conversion process was completed, Reynolds inspected the reconfigured belt wrapper and accepted GB & B's work.
Westinghouse supplied the electrical controls for the CAL, including the belt wrapper, in the 1960s. At that time, Reynolds provided Westinghouse with a full-scale layout of the control station it wanted. Reynolds also specified the types of devices that were to be included in the control stations. Westinghouse drew the schematic for the sequence of operations of the CAL. Westinghouse supplied the logic solenoid, logic relays, motors, operator stations, and control panel for the electrical controls of the CAL. During the design and construction of the control panels, Reynolds instructed Westinghouse to leave additional space on the panels. Reynolds has since used the additional space on the control panels for additional buttons. Reynolds has also removed one of the original operator stations provided by Westinghouse.
Jerry Hannah was a quality-control specialist. His duties included inspecting the recoiler to determine the cause of any scratches on the aluminum. On the day Hannah was killed he had been inspecting the recoiler to determine the source of the scratches that were appearing on the coils of aluminum on the recoiler. Roy Gieske, Peggy Gieske, and Joan Hancock, all Reynolds employees, witnessed the events that culminated with Hannah's becoming trapped between the belt wrapper and the recoiler.
Roy Gieske was operating the CAL when Jerry Hannah was killed. According to Gieske, Hannah had requested that he stop the recoiler so that Hannah could inspect the aluminum for defects. Roy Gieske stopped the recoiler from the control station and walked to the end of the CAL, where the belt wrapper and the recoiler were located. Reynolds employees were instructed to insert a safety or restraining pin into the belt wrapper to prevent its movement before entering the area between the belt wrapper and the recoiler. Roy Gieske noticed that when Hannah walked into the area between the belt wrapper and the recoiler the safety pin had been placed in the belt wrapper to prevent its movement. According to Gieske, Hannah was the only person in the area at the time, and, therefore, he must have inserted the safety pin. Gieske and Hannah walked between the belt wrapper and the recoiler to examine the aluminum. Hannah examined the recoiler at least once more without complication.
Near the end of his shift, Hannah decided to examine the recoiler for a third time. Roy Gieske, Peggy Gieske, and Joan Hancock had been in the operator station during Hannah's first two inspections. Before Hannah inspected the recoiler a third time, Peggy Gieske, Roy Gieske's wife, left the operator station to return to her work station. Joan Hancock also left the operator station but could still observe the area between the belt wrapper and the recoiler from her work station. According to Hancock, Hannah was standing on the right side of the coil, on the outer edge. Hancock stated that as Hannah examined the recoiler he would "stretch over," and look and feel to test for scratches. According to Roy Gieske, before Hannah motioned for him to start the recoiler, Hannah had leaned in to look at the recoiler and "may have had one foot in the area between the belt wrapper and the recoiler."
*846 Hannah signaled for Roy Gieske to stop the recoiler and then signaled for Gieske to turn the recoiler slowly. Gieske testified that he stopped the recoiler and that when he restarted it he intended to press the "# 4 bridle button"; however, Gieske said he was distracted and he turned away from the controls. Instead of pressing the "# 4 bridle button," Gieske pressed another button, which caused the belt wrapper to move forward. Although Gieske did not see which button he actually pressed, the general consensus is that Gieske pressed the "belt wrapper traverse in button." When Gieske saw the belt wrapper moving toward Hannah he immediately pressed the retract button; however, the belt wrapper did not retract.
Hancock also saw the belt wrapper as it moved toward Hannah. According to Hancock, the belt wrapper lifted Jerry Hannah and pushed him into the recoiler. Hancock stated in her deposition that the left side of Hannah's upper body was caught between the belt wrapper and recoiler. The right side of Hannah's body remained free. After the belt wrapper was stopped, Hancock attempted to resuscitate Hannah; however, Hannah died from his injuries.
Neither Roy Gieske nor Hancock noticed whether the safety pin was in place at the time of the accident. Roy Gieske and Peggy Gieske both testified that they did not see Hannah remove the belt wrapper's restraining pin after his first inspection of the recoiler. When Reynolds engineers inspected the accident site, they did not find the safety pin in place.
Judy Hannah, Jerry Hannah's widow, sued several defendants, including Danieli Corporation (formerly McKay Corporation), GB & B, and Westinghouse, alleging negligence and breach of warranty based upon the failure of those defendants to include a safety feature, such as a barrier guard, an interlocking device, or a presence-sensing device, in the area between the belt wrapper and the recoiler. Danieli Corporation, GB & B, and Westinghouse each moved for a summary judgment. The trial court entered a summary judgment in favor of GB & B, and Westinghouse; each moved for a summary judgment. The trial court entered a summary judgment in favor of GB & B and Westinghouse; it denied Danieli's motion for a summary judgment. The trial court certified the summary judgments for GB & B and Westinghouse as final. See Rule 54(b), Ala. R. Civ. P.[1] Hannah appeals the summary judgments in favor of GB & B and Westinghouse.

II. Standard of Review

In determining whether a summary judgment was proper, this Court applies the "substantial evidence" rule. Under this rule, once the movant makes a prima facie showing, required by Rule 56(c), Ala. R. Civ. P., that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law, the nonmovant must introduce substantial evidence creating a genuine issue of material fact. Warehouse Home Furnishing Distribs., Inc. v. Whitson, 709 So.2d 1144, 1151 (Ala.1997). Substantial evidence is "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). In reviewing a summary judgment, we examine the evidence in the light most favorable to the nonmovant, and we resolve all doubts against the movant. Cantrell v. North *847 River Homes, Inc., 628 So.2d 551, 553 (Ala.1993).

III. Liability of GB & B

Hannah argues that the trial court erred in entering a summary judgment in favor of GB & B, the company that converted the belt wrapper to its original overwind configuration in 1996, because, she contends, the evidence was sufficient to create a genuine issue of material fact as to whether the absence of a barrier guard between the belt wrapper and the recoiler was an obvious defect that GB & B should have recognized and remedied. According to Hannah, the deposition testimony and affidavits of her mechanical engineering expert, Dr. L.D. Ryan, and the deposition testimony of a certified safety professional, Scott Wells, made a prima facie showing that a contractor such as GB & B has a duty to ensure that effective safeguards are included in the specifications for potentially dangerous machinery such as the belt wrapper before the contractor follows those specifications. Hannah argues that Dr. Ryan's testimony is bolstered in light of regulations promulgated by the Occupational Safety and Health Administration ("OSHA") and the American National Standards Institute ("ANSI") requiring barrier guards at pinch points, such as the area between the belt wrapper and the recoiler.
GB & B argues that the summary judgment in its favor was proper because, it says, GB & B completed the reconfiguration of the belt wrapper in full accordance with the plans and specifications provided by Reynolds. According to GB & B, the plans and specifications submitted by Reynolds were not so obviously defective that no competent contractor would follow them. GB & B argues that Hannah's primary evidence to the contrary consisted of the deposition testimony and affidavits of her expert, Dr. Ryan, and that this Court should not rely on Dr. Ryan's deposition testimony and affidavits, because, according to GB & B, Dr. Ryan's testimony was inadmissible.[2]

A. Was the Absence of a Barrier Guard an Obvious Defect?

The law in Alabama regarding the liability of contractors who carry out construction projects based upon the plans and specifications of the owner was recognized in McFadden v. Ten-T Corp., 529 So.2d 192, 200-01 (Ala.1988):
"`An independent contractor owes no duty to third persons to judge the plans, specifications or instructions which he has merely contracted to follow. If the contractor carefully carries out the specifications provided him, he is justified in relying upon the adequacy of the specifications unless they are so obviously dangerous that no competent contractor would follow them.'"
529 So.2d at 200, quoting Hunt v. Blasius, 74 Ill.2d 203, 209, 384 N.E.2d 368, 371, 23 Ill.Dec. 574, 577 (1979).
Based upon the rule recognized in McFadden, "an independent contractor is not free to comply with obviously defective plans and specifications that the contractor should know may create unreasonably dangerous conditions. Rather, a contractor is expected to act reasonably under the particular circumstances in order to avoid accidents." Aldridge v. Valley Steel Constr., Inc., 603 So.2d 981, 984 (Ala.1992). Thus, the mere fact that GB & B followed the plans and specifications *848 supplied by Reynolds does not, in and of itself, shield GB & B from liability if GB & B should have been aware that complying with those plans and specifications would create an unreasonably dangerous condition.
Hannah submitted expert testimony through the deposition testimony and affidavits of Dr. Ryan and Scott Wells. Dr. Ryan was a mechanical engineer, professionally licensed in 11 states, with significant experience in designing and building complex industrial machinery. Dr. Ryan testified that in forming his opinions in this case, he relied upon his personal inspection of the accident site, photographs of the accident site, the original blueprints for the belt wrapper in its "overwind" configuration, a summary of Carlos Gregg's deposition, Roy Gieske's affidavit, an OSHA report, the Reynolds accident report, and a number of depositions, including the depositions of Eric Blackstock and Thomas Thornton, Reynolds engineers; Les Rice, an engineer with McKay Corporation; and John Montoro, a Westinghouse engineer.
In his deposition testimony, Dr. Ryan stated that
"the absence of a barrier guard at the area between the belt wrapper and the recoiler [was] a defect that should have been obvious to an experienced general contractor like [GB & B], who had been doing jobs like this at Reynolds for many years, especially given the fact that OSHA and its safety standards had been in effect for over 20 years by this time."
Dr. Ryan further testified:
"Carlos Gregg, the principal of [GB & B], is a professional engineer. As such, he has a special, sworn duty to uphold the safety and well being of the public. He should have readily seen ... the absence of a barrier guard at the area between the belt wrapper and the recoiler, recognized it for the defect it is and [called] that defect to Reynolds's attention."
In addition to Dr. Ryan's deposition testimony, Hannah submitted two affidavits one dated June 21, 2001, and one dated July 27, 2001in which Dr. Ryan opined that GB & B should have been on notice of the hazard of failing to include a barrier guard between the belt wrapper and the recoiler. In his June 21, 2001, affidavit Dr. Ryan stated:
"The absence of a barrier guard was an obvious defect in the plans developed for the `conversion to overwind' project, given the fact that OSHA had, since the early 1970's, mandated the use of barrier guards in situations like this.... A competent contractor should have seen that the absence of a barrier guard and the absence of a lockout/tagout device posed a serious hazard at the point created by the belt wrapper and the recoiler and should have warned Reynolds of the problem. Most of the industrial general contractors that I have dealt with in my years of experience in this field would have noted the missing barrier guard and missing lockout/tagout device in this case and, at a bare minimum, would have alerted Reynolds in writing of the problem. Many times I have seen situations like this arise and the general contractor would simply assume that the owner and/or designer intended for safeguarding to be installed and would include adequate safeguarding measure[s] in their bid and their work on the project as a matter of course. [GB & B's] failure to at least notify Reynolds of the problem simply falls below the level of care most industrial contractors would give to such a situation."
In his July 27, 2001, affidavit, Dr. Ryan stated:
*849 "Just yesterday, I learned that I had overlooked ANSI B11.18, which specifically applies to coil processing machinery including the recoiler and belt wrapper that caused Jerry Hannah's death.... This standard, promulgated by the American National Standards Institute in May of 1985, requires a `rebuilder' of this kind of machinery, like [GB & B], to see to it that it is effectively safeguarded. (ANSI B11.18, 1.2.4, p. 9; 6.1, p. 26.) In particular, this standard requires barrier guards or other effective means of guarding at hazardous areas such as pinch points like the area between the recoiler and belt wrapper where Jerry Hannah was crushed and killed....
"ANSI B11.18 had been in force for over a decade when [GB & B] rebuilt the recoiler and belt wrapper in May of 1996, just weeks before Jerry Hannah was killed. They should have realized, as a competent contractor and rebuilder, that the belt wrapper and recoiler posed an extremely hazardous pinch point and that the absence of a barrier guard or other effective safeguards was an obvious defect in the plans. [GB & B's] failure to, at least, notify Reynolds of the problem violated the duty imposed by ANSI B11.18. It ... also falls far short of what most industrial contractors would do in a situation like this."
In addition to the deposition testimony and affidavits of Dr. Ryan, Hannah also relied upon the deposition testimony of Scott Wells, a certified safety professional employed by Reynolds. Wells did not testify that the absence of a barrier guard was an obvious defect that GB & B should have recognized. However, Wells did testify that when an contractor performs a job, the contractor should try to ensure that when the contractor leaves, the project will be in a safe condition. According to Wells, a contractor does this by following all OSHA regulations, other current regulations, and the national code of ethics for professional engineers.[3] Wells testified that if a contractor observed anything it believed was deficient, that contractor should have brought it to the attention of Reynolds. According to Wells, "[a]nytime you are aware of a pinch point or crush point you should correct it." Wells testified that the area between the belt wrapper and the recoiler was an obvious pinch point and that, in his opinion, the area did not meet OSHA standards. Wells testified that he was not stating that GB & B was aware of the need for a barrier guard in that area; he was saying, however, that if it was, it should have brought that need to Reynolds's attention.
If admissible, Dr. Ryan's deposition testimony and affidavits, coupled with the deposition testimony of Scott Wells, would be sufficient to create a genuine issue of material fact as to whether the absence of a barrier guard between the belt wrapper and the recoiler was an obvious defect that GB & B should have recognized and remedied.

B. Was Dr. Ryan's Testimony Admissible?

GB & B argues that this Court should not consider Dr. Ryan's deposition testimony and affidavits because, it argues, Dr. Ryan was not qualified to render an opinion against an industrial contractor like GB & B and his opinion testimony was inadmissible. GB & B argues that Dr. Ryan's testimony and affidavits are inadmissible for the following reasons: 1) Dr. *850 Ryan was not familiar with the facts of the case; 2) Dr. Ryan overlooked an ANSI standard in his deposition and did not provide a citation to a specific OSHA regulation; 3) Dr. Ryan was not an industrial-construction contractor; 4) Dr. Ryan was inadequately prepared during his deposition; 5) Dr. Ryan attempted to specify the legal duty of contractors in Alabama; 6) Dr. Ryan's opinion was based on speculation; 7) Dr. Ryan's July 27, 2001, affidavit contains inadmissible hearsay and is untimely; and 8) Dr. Ryan's testimony did not confirm that GB & B acted negligently.
It is well established that the question whether a particular witness will be allowed to testify as an expert is largely discretionary with the trial court, and that court's judgment will not be disturbed absent an abuse of discretion. Brown v. Lawrence, 632 So.2d 462, 464 (Ala.1994). The record indicates that GB & B submitted a motion to strike Dr. Ryan's testimony at the trial court. Because there is no indication in the record that the court excluded Dr. Ryan's deposition testimony and affidavits, we must assume that the trial court considered them when it ruled on GB & B's motion for a summary judgment. See Travis v. Ziter, 681 So.2d 1348, 1351 (Ala.1996).
Dr. Ryan stated in his June 21, 2001, affidavit that he received a bachelor of science degree in mechanical engineering from Tri-State University in 1959, and a master's degree in mechanical engineering from the University of Toledo in 1967. Dr. Ryan also held a doctorate degree in agricultural engineering from Michigan State University. He has been a licensed professional engineer since 1967. At the time of his deposition, Dr. Ryan was licensed in 11 states and had applied, and been approved, for a license in the State of Alabama. Dr. Ryan also testified that he had 40 years of experience in both designing and building complex industrial machinery.
The mere fact that Dr. Ryan is not by occupation an industrial-construction contractor, but rather a mechanical engineer, does not preclude him from offering opinion testimony regarding the design and reconfiguration of the belt wrapper. See Ellingwood v. Stevens, 564 So.2d 932, 936 (Ala.1990). "An expert witness is one with `such knowledge, skill, experience, or training ... that his opinion will be considered in reason as giving the trier of fact light upon the question to be determined.'" Quoting C. Gamble, McElroy's Alabama Evidence § 127.01(5) (3d ed.1977). Dr. Ryan testified that he had 40 years of experience in both designing and building complex industrial machinery. Any deficiency in his extensive knowledge in the area of designing and building complex machinery is a proper subject for cross-examination, but it does not disqualify him as an expert.
GB & B's argument that Dr. Ryan's deposition testimony and affidavits are inadmissible because he was not familiar with the facts of the case is without merit. Dr. Ryan stated in his deposition testimony and affidavits that his opinions were based on his personal inspection of the belt wrapper; photographs of the accident site; the original blueprints for the belt wrapper in its overwind configuration; the depositions of engineers employed by Reynolds and Westinghouse, and formerly employed by McKay Corporation; a summary of Carlos Gregg's deposition; Roy Gieske's affidavit; an OSHA report; and the Reynolds accident report. The knowledge upon which Dr. Ryan based his opinion was more than sufficient to permit the trial court to consider his testimony. Furthermore, any objection to Dr. Ryan's testimony based on his alleged lack of knowledge goes to the weight rather than the *851 admissibility of that testimony. Ellingwood, supra; see also Southern Energy Homes, Inc. v. Washington, 774 So.2d 505, 517 (Ala.2000), and Tidwell v. Upjohn Co., 626 So.2d 1297, 1300 (Ala.1993).
In addition, the mere fact that Dr. Ryan overlooked an ANSI standard in his deposition and the fact that Dr. Ryan did not provide a citation to a specific OSHA regulation during his deposition do not alone render his opinion inadmissible. After his deposition was taken and his first affidavit was filed, Dr. Ryan recognized that in addition to violating OSHA regulations and the national code of ethics for engineers, GB & B had violated the ANSI requirement of implementing barrier guards in hazardous areas like the area between the belt wrapper and recoiler. Dr. Ryan pointed this out in his July 27, 2001, affidavit. And although Dr. Ryan could not state during his deposition the citation to the particular OSHA regulation requiring barrier guards, Dr. Ryan did know that such a regulation existed, and he offered to provide a cite to it after his deposition. "`"To qualify as an expert a witness does not have to be shown to be infallible or possessing the highest degree of skill."`" Knapp v. Wilkins, 786 So.2d 457, 461 (Ala.2000), quoting Kitchens v. State, 31 Ala.App. 239, 241, 14 So.2d 739, 741 (1943). Further, "`"[t]he criterion for admission of expert testimony is that the witness, by study, practice, experience or observation as to the particular subject, should have acquired a knowledge beyond that of ordinary witnesses."'" Knapp, supra, quoting Kitchens, supra.
GB & B's argument that Dr. Ryan's testimony should be excluded because he was "inadequately prepared" during his deposition is also without merit. First, GB & B provides no support for the theory that an expert's testimony can be inadmissible on the basis that the expert did not prepare as thoroughly as the opposing party would have liked. Rule 28(a)(5), Ala. R.App. P., requires that an appellant provide citations to the authorities relied upon in the argument portion of the appellant's brief. Rule 28(b) provides that the appellee's brief shall conform to the same requirement. GB & B cites no authority for the proposition it advances.
Second, GB & B's conclusion that Dr. Ryan was not prepared for his deposition because he did not review the plans and specifications for the reconfiguration of the belt wrapper and did not read Carlos Gregg's deposition is tenuous. Dr. Ryan stated in his June 21, 2001, affidavit that he reviewed the original blueprints for the belt-wrapper project because he had learned from the deposition of Eric Blackstock, a Reynolds engineer, that no new drawings had been prepared for the project. Instead, the original drawings were used, and parts lists and procedures for the project were developed from those drawings. In addition, the broad statement that Dr. Ryan did not read the deposition of Carlos Gregg is misleading. Dr. Ryan stated that he had assigned his associate engineers to read Gregg's deposition and to prepare a summary of that deposition. Dr. Ryan then read the summary of Gregg's deposition. Neither of GB & B's arguments regarding Dr. Ryan's preparation for his deposition renders Dr. Ryan's testimony inadmissible.
GB & B also argues that Dr. Ryan's deposition testimony should be excluded because, according to GB & B, Dr. Ryan attempted to define a legal standard by which GB & B should be held accountable. Dr. Ryan stated in his deposition:
"Ordinarily, a general contractor would only have a duty to follow the engineered plans provided to it. However, two exceptions apply to the general rule *852 and both are applicable to this case. First, even a general contractor has a duty to bring to the purchaser's attention any obviously substandard plans it is called upon to execute...."
Generally, a witness, whether expert or lay, cannot give an opinion that constitutes a legal conclusion or amounts to the application of a legal definition. Phillips v. Harris, 643 So.2d 974, 976 (Ala.1994); see also C. Gamble, McElroy's Alabama Evidence § 128.07 (5th ed.1996). We do not agree, however, that one statement by an expert witness explaining a legal standard in the industry as to which that witness is an expert invalidates that portion of the expert's testimony that does not pertain to that legal standard. Thus, even if we exclude from his testimony, Dr. Ryan's explanation of the legal duty GB & B owed, Dr. Ryan's testimony that GB & B should have recognized the need for a barrier guard would not be inadmissible.
The same rationale applies to GB & B's argument that Dr. Ryan's July 27, 2001, affidavit is inadmissible because it contains hearsay: in it Dr. Ryan recounts his previous testimony. Even if this Court were to exclude Ryan's July 27, 2001, affidavit, which recounts his prior testimony, that prior testimony is not excluded because it is also contained in Ryan's deposition and his June 21, 2001, affidavit. Thus, Ryan's testimony that GB & B should have recognized and remedied the obvious hazard of the "pinch point" between the belt wrapper and the recoiler is still admissible.
Finally, GB & B argues that the July 27, 2001, affidavit of Dr. Ryan was untimely because, according to GB & B, it was filed one month after the trial court entered its summary judgment. The affidavit was submitted in support of Hannah's Rule 59, Ala. R. Civ. P., motion to alter, amend, or vacate the summary judgment in favor of GB & B. GB & B argues that Rule 56(c)(2), Ala. R. Civ. P., requires that opposing affidavits be submitted at least two days before the hearing on the summary-judgment motion. According to GB & B, the July 27, 2001, affidavit was inadmissible because, it says, the affidavit did not contain new evidence; GB & B argues that the information contained in the affidavit had been available since 1985. GB & B is correct that a Rule 59(e) motion does not operate to extend the time for filing affidavits or other material in opposition to a motion for summary judgment if by "due diligence" the new evidence could have been discovered before the motion for summary judgment was submitted. See Moore v. Glover, 501 So.2d 1187, 1189 (Ala. 1986). However, GB & B fails to recognize that, even if this Court were to exclude Dr. Ryan's July 27, 2001, affidavit, there still exists substantial evidence in the form of deposition testimony and the June 21, 2001, affidavit by which Dr. Ryan expressed the opinion that GB & B should have recognized the obvious hazard of the absence of a barrier guard between the belt wrapper and the recoiler.
Based upon the foregoing, we must conclude that Dr. Ryan's deposition testimony and his affidavit of June 21, 2001, were admissible. We decline to determine whether Dr. Ryan's July 27, 2001, affidavit was admissible, because, without that affidavit, there exists substantial evidence creating a genuine issue of material fact as to whether the plans and specifications GB & B relied upon were so obviously defective that a reasonable contractor would be put on notice that the absence of a barrier guard would be dangerous and would likely cause injury. The trial court erred in entering a summary judgment in favor of GB & B.

IV. Liability of Westinghouse

Hannah also argues that the trial court erred in entering a summary judgment for *853 Westinghouse, the company that manufactured the electrical controls for the CAL, because, she contends, there was substantial evidence creating a genuine issue of material fact as to whether Westinghouse negligently designed the control logic of the CAL and negligently manufactured the electrical controls that initiated operation of the machines on the CAL. In support of her argument, Hannah submitted the deposition testimony of two experts, Dr. Ryan, the mechanical engineer who also testified against GB & B, and Dr. David Conner, an electrical engineer; both experts agreed that Westinghouse failed to include appropriate safety devices in the design and installation of the electrical controls for the CAL.
Dr. Ryan testified in deposition that, although Reynolds had designed the layout of the buttons on the control panel, Westinghouse should have taken affirmative steps to suggest a different design for the panel. Dr. Ryan stated that Westinghouse should have suggested a different placement of the buttons on the control panel or different proximity of the buttons to one another or a color-coding system for the buttons. According to Dr. Ryan, Westinghouse constructed the control panel in a "mirror image" designeach button on the panel looked the same. Dr. Ryan testified that the "traverse in button," the button that started the belt wrapper, should have been entirely different from the other buttons, i.e., it should have been either recessed or a twist-type button, in order that it could be easily distinguished from the other buttons on the control panel. Dr. Ryan also stated that Westinghouse should have included an interlock feature by which power to the belt wrapper could be turned off, while the remaining machines on the CAL continued running. In addition, Dr. Ryan stated that Westinghouse should have included an audible warning in its control circuitry to warn employees in the area when the belt wrapper was moving forward.
Dr. Conner, Hannah's electrical engineering expert, agreed that Westinghouse had failed to include appropriate safety devices in the electrical control system. According to Dr. Conner, Reynolds was not an active participant in the design decisions. Dr. Conner testified that, in terms of the design activity, once the electrical designer receives the specifications, the customer relies upon the electrical designer to decide what the logic circuitry will look like, what components will be placed in the logic circuit, and how these actions of the circuitry will be represented. Dr. Conner testified:
"[I]n a design environment when a system is being designed, the designer should not only take a look at the operation of the electrical aspects of the system, but also involve in the design the various human interactions with the system and ensure that the human interactions are such that the individuals that are coming involved with the system cannot be injured in any way."
According to Dr. Conner, Westinghouse did not include any interventions in the electrical system to protect individuals who would be working in the area between the belt wrapper and the recoiler. Dr. Conner stated that Westinghouse should have included an optical device that could sense the presence of a body in the area between the belt wrapper and recoiler and activate a warning light, which would then deactivate the power. Dr. Conner also stated that Westinghouse could have included a mechanical device that would sense the pressure or weight of an individual and cause a warning signal to occur, leading to electrical lockout.
Westinghouse argues, although not in the following sequence: 1) that it cannot *854 be held liable for any defects in the belt wrapper because it was not the manufacturer of the belt wrapper; 2) that it cannot be held liable under the AEMLD for its drawing of the control logic or for supplying the control panel because, it argues, neither are "products" under the AEMLD; 3) that it cannot be held liable for alleged defects in the control logic and the control panels because both underwent substantial modification by Reynolds following their installation by Westinghouse; 4) that Westinghouse owed no duty to Hannah to inspect the belt wrapper for safety or to warn of the dangers posed by the belt wrapper; and 5) that Hannah failed to demonstrate the availability of a feasible alternative design.[4]

A. What was Westinghouse's Role in the Design and Construction of the Electrical Control System?

Westinghouse argues that it cannot be held liable for the injuries Hannah sustained because it did not manufacture the belt wrapper or any component parts of the belt wrapper. Westinghouse's argument fails, however, because Hannah has not alleged that Westinghouse negligently manufactured the belt wrapper; she argues that Westinghouse negligently manufactured the electrical controls, which directly controlled the movement of the belt wrapper. It is undisputed that the electrical controls provided by Westinghouse initiated the movement of, and controlled the retraction of, the belt wrapper. According to Hannah's expert, Dr. Ryan, the electrical controls manufactured by Westinghouse told the belt wrapper "when to go and how to do it." Hannah's claims are not based upon the theory that the belt wrapper itself was defective, but rather that the belt wrapper could have been safeguarded by including certain safety features in the electrical controls that operated the belt wrapper.

B. Are the Control Logic and Control Panels "Products" Under the AEMLD?

Westinghouse also contends that it cannot be held liable under the AEMLD for its drawing of the control logic or supplying the control panels because, it argues, neither are products under the AEMLD. Relying upon Oxford Lumber Co. v. Lumbermens Mutual Insurance Co., 472 So.2d 973 (Ala.1985), Westinghouse argues that its work of drawing the control logic for the belt wrapper can be viewed only as a service and is not proper for consideration under the AEMLD.
In Oxford Lumber Co., the plaintiffs sought recovery under the AEMLD for a "defective" insurance contract. Unlike Westinghouse, however, the defendant in Oxford Lumber Co. did not manufacture any item of which the plaintiff could physically make use. In this case Westinghouse designed the control system, the regulating system, and the tension and speed control of the CAL. In addition, Westinghouse supplied motors, the control for the motors, desks, operators stations, control cabinets, the equipment to control the speed and tension of the process line, the logic solenoid, and the logic relays, all in accordance with the design of the electrical circuitry. The combination of the products supplied by Westinghouse made up the electrical controls of the CAL; thus, Westinghouse provided more than simply a service to Reynolds.
Westinghouse also argues that it cannot be sued under the AEMLD because the control logic and control panels can be viewed only as component parts of the CAL, and under Alabama law, Westinghouse *855 cannot be held liable for defects unrelated to the component parts it supplied. See Sanders v. Ingram Equip., Inc., 531 So.2d 879, 880 (Ala.1988). This argument is unpersuasive, however, because Hannah does not claim that Westinghouse manufactured component parts of a defective belt wrapper; Hannah contends that the electrical controls supplied by Westinghouse are themselves defective because, she argues, possible safety devices within the controls were omitted. Sanders is inapplicable when the plaintiff seeks to recover based upon the theory that the product supplied by the defendant is itself defective.

C. Did Reynolds Substantially Modify the Control Panels?

An essential element of an AEMLD claim is proof that the product reached the consumer without substantial change in the condition in which it was sold. Sears, Roebuck & Co. v. Harris, 630 So.2d 1018, 1027 (Ala.1993); see also Clarke Indus., Inc. v. Home Indem. Co., 591 So.2d 458, 462 (Ala.1991). However, the mere fact that a product has been altered or modified does not necessarily relieve the manufacturer or seller of liability. Sears, Roebuck & Co., supra; see also Johnson v. Niagara Machine & Tool Works, 555 So.2d 88, 91 (Ala.1989). A manufacturer or seller remains liable if the alteration or modification did not in fact cause the injury, or if the alteration or modification was reasonably foreseeable to the manufacturer or seller. Sears, Roebuck & Co., supra; see also Industrial Chem. & Fiberglass Corp. v. Hartford Accident & Indem. Co., 475 So.2d 472, 476 (Ala.1985), and Clarke Indus., 591 So.2d at 462.
The record indicates that Westinghouse designed the control system, the regulating system, and the tension and speed control of the CAL according to specifications supplied by Reynolds. In addition, Westinghouse supplied the motors, the control for the motors, desks, operator stations, control cabinets, and the equipment to control the speed and tension of the CAL. Since Westinghouse originally designed the electrical controls, Reynolds has altered the control system in several respects. First, Reynolds removed switches from the control panel. Reynolds disconnected the "lift-limit" switch from the control panel, which removed one of the several conditions that originally had to be met before the "traverse in" button would move the belt wrapper. Reynolds also removed a "WRCEN" switch, which was used to center the coil. Second, Reynolds eliminated at least one of the operator stations designed by Westinghouse, combining functions that under Westinghouse's design would have been performed at different stations. Third, Reynolds added buttons to the control panel. As originally designed, the control panel did not include the "# 4 bridle button," the button Roy Gieske intended to press when he inadvertently pressed another button that started the belt wrapper. Reynolds also added a "delivery normal stop inspection" circuit, which allowed workers to stop the coil in the middle of a run. Reynolds's alteration to the number of operator stations and to the control panel of the CAL constitutes a substantial alteration of the electrical control system.
Although Reynolds modified the electrical control system, Westinghouse's expert, John Montoro, admitted in his deposition that most of those modifications played no role in causing and did not contribute to the accident that killed Jerry Hannah. According to Montoro, Reynold's disconnection of the "lift-limit switch," the addition of a "delivery normal stop inspection" circuit, and the removal of one operator *856 station did not cause the accident that killed Jerry Hannah. According to Montoro, the only change that may have contributed to Jerry Hannah's death was the addition of the "# 4 bridle button." Montoro testified that the addition of this button may have confused Gieske, causing him to press the wrong button.
Hannah argues that even if the changes to the control panel constitute a "substantial alteration" of the electrical controls originally designed by Westinghouse, Westinghouse is still liable because, she argues, the alterations were reasonably foreseeable. In support of her argument, Hannah relies upon the deposition testimony of John Montoro. In that deposition Montoro stated that Reynolds had instructed Westinghouse to leave additional space on the control panel. Montoro admitted in his deposition that Reynolds's request for extra space on the control panel presumed that Reynolds contemplated adding more buttons on the control panel. In addition, Montoro stated that leaving extra space on a control panel was a "common thing." According to Montoro, "[companies] always want space just in case they change their mind." Montoro's testimony shows that a genuine issue of material fact exists as to whether the alteration of the control panel, by the addition of the "# 4 bridle button," the only modification that might have contributed to Hannah's death, was reasonably foreseeable. See Hicks v. Commercial Union Ins. Co., 652 So.2d 211, 218 (Ala.1994).

D. Did Westinghouse Owe Hannah a Duty to Inspect the Belt Wrapper for Safety or to Warn of Dangers of the Belt Wrapper?

Westinghouse also contends that it owed no duty to Hannah to provide guarding for the belt wrapper. Relying upon R.L. Reid, Inc. v. Plant, 350 So.2d 1022 (Ala.1977), and Mueller Co. v. Trambeam Corp., 693 So.2d 1380 (Ala.Civ.App. 1997), Westinghouse contends that its work was unrelated to the belt wrapper. Westinghouse argues that, because it was not involved with any mechanical aspects of the belt wrapper, it owed no duty to inspect the belt wrapper and that it cannot be held liable for any alleged negligence relating to the belt wrapper.
The standard of duty this Court applied to GB & B, as stated earlier, was set forth in McFadden:
"`An independent contractor owes no duty to third persons to judge the plans, specifications or instructions which he has merely contracted to follow. If the contractor carefully carries out the specifications provided him, he is justified in relying upon the adequacy of the specifications unless they are so obviously dangerous that no competent contractor would follow them.'"
529 So.2d at 200, quoting Hunt v. Blasius, 74 Ill.2d at 209, 384 N.E.2d at 371, 23 Ill.Dec. at 577. The standard set forth in McFadden, however, is inapplicable to Westinghouse because Westinghouse's role in the design and construction of the electrical control system was more than that of a contractor. Westinghouse did not simply follow plans and specifications to design the electrical control system. Reynolds provided Westinghouse with a layout of the electrical control system it wanted and specified the types of devices to include in the operator stations. Westinghouse actually designed the schematic for the sequence of operations of the CAL. According to Hannah's electrical engineering expert, Reynolds relied upon Westinghouse to design the logic circuitry and to decide what components would be placed in the logic circuitry and how the actions performed by the circuitry would be represented. The McFadden test is therefore *857 inapplicable. Instead, Westinghouse's duty hinges upon foreseeability. A duty of care arises when it is foreseeable that harm may result if care is not exercised. Lance, Inc. v. Ramanauskas, 731 So.2d 1204, 1208 (Ala.1999).
Westinghouse argues that R.L. Reid and Mueller are both applicable to the question of duty. However, after careful consideration of both cases, we conclude that R.L. Reid and Mueller are distinguishable from the present case. In R.L. Reid, the plaintiff sued R.L. Reid, a consulting engineering firm, arguing that its faulty specifications of a loading facility had caused the death of her husband. 350 So.2d at 1023. Specifically, the plaintiff argued that the defendant had negligently failed to provide a guard to shield workers from the opening of a belt feeder, a machine used to transfer bulk ore to railroad cars, for loading on the cars. 350 So.2d at 1023. The plaintiff's husband, a crane operator at the facility, was killed when his body was pulled through the opening of the belt feeder. 350 So.2d at 1025.
Before the accident, the Alabama State Docks Department had hired R.L. Reid to prepare the plans and specifications for the modification of its loading facility. Significantly, the evidence indicated that the plan originally submitted by R.L. Reid would have made the machine inaccessible to workers at the loading facility. 350 So.2d at 1027. The State Docks, however, opted not to follow those plans. Had they done so, the danger of the opening in the belt feeder would have been alleviated, and a guard would not have been necessary. Based upon that evidence, this Court concluded that the plaintiff had failed to establish that R.L. Reid had breached any duty to the decedent by failing to recommend the installation of a safeguard at the point where the decedent met his death. Id. at 1027.
In the present case, there is no indication that Westinghouse suggested the inclusion of an interlocking device or any pressure- or presence-sensing devices that would have deactivated power to the belt wrapper and prevented the accident that killed Jerry Hannah. The evidence is uncontradicted that, unlike R.L. Reid, Westinghouse provided no safety features in its design and construction of the control panels and electrical circuits for the CAL. Hannah introduced two experts who both testified that Westinghouse should have known to include a safety device, such as an interlocking or pressure-sensing device, in the electrical controls.
Mueller, a case decided by the Court of Civil Appeals, is also distinguishable. In Mueller, the defendant, HSI, was hired only to inspect the mechanical functions of a "bridge crane" and runway system of a foundry used to produce fire hydrants. The facility operated two overhead cranes that were supported by hangers connected by bolts to a track or runway. The owner of the foundry sued HSI when one of those bolts fractured, causing the crane to collapse. 693 So.2d at 1382. In support of its argument that it owed no duty to the plaintiff to inspect the cranes on the runway system, HSI submitted expert testimony indicating that the runway system did not have any electrical or mechanical components that HSI would have been required to inspect. 693 So.2d at 1385. Based upon this evidence, the Court of Civil Appeals concluded that HSI owed no duty to the foundry, because the collapse of the crane was unrelated to any mechanical function. 693 So.2d at 1385.
In the present case, Hannah submitted the deposition testimony and affidavits of a mechanical engineer, Dr. Ryan, and the deposition testimony of an electrical engineer, Dr. Conner, who both agreed that the electrical controls provided by Westinghouse *858 directly controlled the movement and the retraction of the belt wrapper. Dr. Ryan, Hannah's mechanical engineering expert, testified that the electrical controls Westinghouse designed told the belt wrapper "when to go and how to do it." According to Hannah's experts, Westinghouse could have designed a safety feature within the electrical control system that would have prevented the accident that killed Jerry Hannah.
In addition, Dr. Ryan, Hannah's mechanical engineering expert, and Les Rice, a former McKay project engineer, both testified in deposition that, because the buttons on the control panel were exposed, it was foreseeable that someone would mistakenly hit the wrong button. According to Dr. Ryan, Westinghouse should have included an electrical lockout feature in its design to reduce the risk of harm to workers on the CAL. Rice testified that it was standard electrical engineering practice to include an interlock or "prevent mode" in the system to prevent damage to the machinery or harm to personnel. Rice also testified that this normally would have been the responsibility of McKay, the manufacturer of the belt wrapper; however, if McKay failed to do so, Westinghouse should have noticed the absence of an interlock or prevent mode and brought it to McKay's attention.
Viewing the evidence in the light most favorable to Hannah, as we must, we hold that Hannah presented substantial evidence creating a jury question as to whether Westinghouse owed a duty of care to Hannah.

E. Was There a Feasible Alternative Design and Construction of the Control Panel?

Westinghouse also contends that even if the control logic and the control panels are products under the AEMLD, Hannah failed to demonstrate that a feasible alternative design was available that would have reduced or eliminated Jerry Hannah's injuries.
In order to prove that a product is defective for purposes of the AEMLD, a plaintiff must prove that
"`a safer, practical, alternative design was available to the manufacturer at the time it manufactured the [product]. The existence of a safer, practical, alternative design must be proved by showing that:
"`(a) The plaintiff's injuries would have been eliminated or in some way reduced by use of the alternative design; and that
"`(b) taking into consideration such factors as the intended use of the [product], its styling, cost, and desirability, its safety aspects, the foreseeability of the particular accident, the likelihood of injury, and the probable seriousness of the injury if that accident occurred, the obviousness of the defect, and the manufacturer's ability to eliminate the defect, the utility of the alternative design outweighed the utility of the design actually used.'"
Beech v. Outboard Marine Corp., 584 So.2d 447, 450 (Ala.1991) (second emphasis added), quoting General Motors Corp. v. Edwards, 482 So.2d 1176, 1191 (Ala.1985), overruled on other grounds, Schwartz v. Volvo North America Corp., 554 So.2d 927 (Ala.1989).
Hannah's experts, Dr. Ryan and Dr. Conner, described five feasible alternative designs Westinghouse could have used in the design and construction of the electrical controls for the CAL. According to Dr. Ryan, Westinghouse could have included a "Blackstock Fix" in the electrical control design, a feature by which, once the "line run button" was pressed, the "traverse" *859 function of the belt wrapper would be locked out. Dr. Ryan did not specifically state that the "Blackstock Fix" would have eliminated or in some way reduced the injuries Jerry Hannah suffered; however, Dr. Ryan did testify that the "Blackstock Fix" feature would have locked out the belt wrapper:
"[Ryan:] ... One of the criticisms is that... Westinghouse should have put in a Blackstock Fix. Being when you hit the line run button, it locks the traverse function of the belt wrapper, locks it in."
"....
"[Ryan:] Stays locked out until the mandrel is collapsed and that, in other words, being the mandrel, what we are calling the Blackstock Fix, or something to that or better than that. That would have helped."
An essential element of proof as to whether a safer, feasible alternative design was available is proof that the plaintiff's injuries would have been eliminated or in some way reduced by use of the alternative design. Beech v. Outboard Marine Corp., 584 So.2d at 450. Although Dr. Ryan did not state that Jerry Hannah's injuries would have been eliminated or in some way reduced had the "Blackstock Fix" feature been in place, because the "Blackstock Fix" would have "locked in" the belt wrapper, it is axiomatic that if such a feature had been incorporated Gieske could not have pressed a button on the control panel that would cause the belt wrapper to move forward, killing Jerry Hannah.
Dr. Conner testified that Westinghouse could have implemented an optical device that could sense the presence of a person and activate a warning light, which would in turn deactivate power, causing the belt wrapper to stop. According to Dr. Conner, another safety device Westinghouse could have included in its design of the electrical controls was a mechanical device to sense the pressure or weight of an individual and in turn cause a warning signal to occur and then an electrical lockout. Dr. Conner did not state whether these devices alone would make the belt wrapper safe. According to Dr. Conner, an adequate safety regime would also include a barrier guard. Although Dr. Conner did not state whether these devices would have eliminated or reduced the injuries Jerry Hannah suffered, because these devices would have deactivated power to the belt wrapper, it is again axiomatic that if one of these features had been in place, the accident that killed Jerry Hannah would not have occurred.
Further, the deposition testimony of John Montoro, a Westinghouse engineer, also creates a genuine issue of material fact regarding whether an emergency override button, pressure mats, or an electrically interlocked barrier was a feasible alternative. Montoro testified as follows:
"[Q] [D]evice that interlocksautomatically interlocks thethe belt wrapper traverse in function, will itis there any electrical operation reason why it should not be incorporated in there? Not is there a safety reason. Is there an electrical function operatereason why they
"[Montoro:] The reason why we couldn'tI have already told you we didn't do that. You could put an electrical circuit in to do this?
"....
"[Montoro:] You could. You could make a design like this.
"Q. And
"[Montoro:] Use these curtains and lights, curtains so on.

*860 "Q. And are thesethe pressure pads, the light[,] curtains, are they economically feasible to put in?
"[Montoro:] I don't know. I have no idea what they cost. I never used them.
"....
"Q. Is there any reason that an emergency override button specific to the belt wrapper traverse out function could not have been installed, incorporated, that would allow energy to flow to the solenoid to send a signal to traverse out irregardless [sic] of any other conditions being met as an emergency device?
"[Montoro:] Certainly you can put a button in that will directly pick up that relay.
"....
"Q. Is it economically feasible?
"[Montoro:] It is not going to cost much."
Montoro's deposition testimony, together with the testimony of Hannah's experts, Dr. Ryan and Dr. Conner, create a genuine issue of material fact as to whether a safer, feasible alternative design was available that may have eliminated or reduced the risk of injury to Jerry Hannah. We also note that, in addition to the interlocking device, the presence, and pressure sensing devices, Hannah's experts offered other possible alternatives. Because we have already concluded that a genuine issue of material fact exists regarding whether a feasible alternative was available necessitating a trial on other feasible alternatives, we do not reach these additional issues.

V. Contributory Negligence

GB & B and Westinghouse both argue that Jerry Hannah was contributorily negligent. Relying upon a Reynolds accident investigation report and the deposition testimony of Eric Blackstock, a Reynolds engineer, both defendants contend that Hannah failed to insert the safety pin in the belt wrapper before he inspected the recoiler. According to GB & B and Westinghouse, Jerry Hannah's alleged failure to insert the safety pin in the belt wrapper serves as a complete bar to Hannah's claims under the AEMLD, as well as to Hannah's negligence and wantonness claims. Hannah argues that the Reynolds accident report is inadmissible because, she says, it contains hearsay; she further argues that there is sufficient evidence to create a jury question regarding whether Hannah appreciated the danger posed by the belt wrapper at the moment of his accident.
A plaintiff cannot recover in a negligence action where the plaintiff's own negligence is shown to have proximately contributed to his damage, notwithstanding a showing of negligence on the part of the defendant. Watters v. Bucyrus-Erie Co., 537 So.2d 24 (Ala.1989); Brown v. Piggly-Wiggly Stores, 454 So.2d 1370, 1372 (Ala.1984). Likewise, a plaintiff's contributory negligence will preclude recovery in an AEMLD action. Campbell v. Cutler Hammer, Inc., 646 So.2d 573 (Ala. 1994). The question of contributory negligence is normally one for the jury. However, where the facts are such that all reasonable persons must reach the same conclusion, contributory negligence may be found as a matter of law. Brown, supra; see also Carroll v. Deaton, Inc., 555 So.2d 140, 141 (Ala.1989).
To establish contributory negligence as a matter of law, a defendant seeking a summary judgment must show that the plaintiff put himself in danger's way and that the plaintiff had a conscious appreciation of the danger at the moment the incident occurred. See H.R.H. Metals, Inc. v. Miller, 833 So.2d 18 (Ala.2002); see *861 also Hicks v. Commercial Union Ins. Co., 652 So.2d 211, 219 (Ala.1994). The proof required for establishing contributory negligence as a matter of law should be distinguished from an instruction given to a jury when determining whether a plaintiff has been guilty of contributory negligence. A jury determining whether a plaintiff has been guilty of contributory negligence must decide only whether the plaintiff failed to exercise reasonable care. We protect against the inappropriate use of a summary judgment to establish contributory negligence as a matter of law by requiring the defendant on such a motion to establish by undisputed evidence a plaintiff's conscious appreciation of danger. See H.R.H. Metals, supra.
Applying these principles to the present case, we find it significant that none of the witnesses who saw Jerry Hannah immediately before the accident stated that he was standing in the area between the belt wrapper and the recoiler as he inspected the recoiler. To the contrary, Roy Gieske, the control station operator, testified in deposition that he saw Jerry Hannah lean in to look at the recoiler. According to Gieske, Hannah may have had one foot in the area between the belt wrapper and the recoiler. Joan Hancock testified in deposition that Hannah was standing on the right side of the coil, on its outer edge. According to Hancock, Jerry Hannah would lean over to examine the coil if he observed any scratches. Hancock also testified that only the left portion of Hannah's body was caught between the belt wrapper and the recoiler and that the right side of his body remained free. Thus, the evidence does not clearly establish that Jerry Hannah was standing directly between the belt wrapper and the recoiler, the area where one might expect the greatest danger.
In addition, contrary to the Reynolds accident report, Hannah introduced evidence indicating that the belt wrapper safety pin may have been in place at the time of Hannah's accident. Roy Gieske testified in deposition that he noticed the safety pin was in place when he and Hannah first inspected the belt wrapper on the morning of Hannah's death. Gieske testified that he did not see Jerry Hannah remove the safety pin. Gieske also testified that he did not notice whether the safety pin was in place the last time Jerry Hannah checked the recoiler.
Hannah's mechanical engineering expert, Dr. Ryan, inspected the accident site. Dr. Ryan testified that at the time of Hannah's accident, the safety pin may or may not have been set in place. According to Dr. Ryan, during his inspection of the accident site, he found that the safety pin was bent and that it was possible to drop the safety pin in, without the pin actually locking into position. Dr. Ryan stated that he had to carefully align the safety pin to make it lock into position. Dr. Ryan also stated that if the pin was set, it could have easily gotten caught on a ledge, preventing it from locking into position.
The Reynolds accident report alleges that Jerry Hannah failed to insert the safety pin in the belt wrapper before inspecting the recoiler. The report clearly contains hearsay and would be inadmissible at trial absent a showing that it falls within an exception to the hearsay rule. See Hampton v. Bruno's, Inc., 646 So.2d 597 (Ala.1994). However, we need not address whether the report falls within an exception to the hearsay rule, because even if the report were admissible, Reynolds's findings do not conclusively prove that Jerry Hannah was contributorily negligent. Based upon Hannah's evidence, a jury could conclude that at the time of his accident, Jerry Hannah was standing in *862 what he may have believed to be a safe position, on the outer edge of the recoiler and that he did not appreciate the danger posed by the belt wrapper. A jury could also conclude that Hannah may have inserted the safety pin, believing that it was set, but that the bend in the pin did not allow it to properly lock. Either way, we cannot say that the facts are such that all reasonable persons must reach the same conclusion regarding whether Hannah was contributorily negligent. Whether Hannah was contributorily negligent is a question that must be left to the finder of fact to determine.

VI. Conclusion

Based upon the foregoing, we conclude that Hannah presented substantial evidence creating a genuine issue of material fact regarding whether the absence of a barrier guard between the belt wrapper and recoiler was an obvious defect that GB & B should have recognized and remedied. Hannah has also produced substantial evidence in support of her claim that Westinghouse negligently designed the control logic and electrical controls which initiated operation of the machines on the CAL. Accordingly, we reverse the trial court's judgments for GB & B and Westinghouse and remand the case for further proceedings.
REVERSED AND REMANDED.
MOORE, C.J., and HOUSTON, BROWN, JOHNSTONE, HARWOOD, WOODALL, and STUART, JJ., concur.
SEE, J., concurs in part and dissents in part.
SEE, Justice (concurring in part and dissenting in part).
I dissent from Part IV.C. of the main opinion, which addresses Hannah's AEMLD claim against Westinghouse. Liability under the AEMLD requires that the product reach the consumer without substantial change from its original condition. See Sears, Roebuck, & Co. v. Harris, 630 So.2d 1018, 1027 (Ala.1993). There is an exception to this rule for modifications that are reasonably foreseeable, see Sears, supra, and Industrial Chem. & Fiberglass Corp. v. Hartford Accident & Indem. Co., 475 So.2d 472, 476 (Ala.1985). However, while it was reasonably foreseeable that Reynolds would modify the control panel, the modifications Reynolds made to the control panel supplied by Westinghouse such as removing buttons, consolidating tasks controlled by the buttons on the control panel, and installing additional buttons similar to preexisting buttonswere not reasonably foreseeable. I, therefore, dissent from the main opinion to the extent that it reverses the summary judgment for Westinghouse on this issue. In all other respects, I concur in the main opinion.

On Applications for Rehearing
LYONS, Justice.
On rehearing, Gregg, Bland & Berry, Inc. ("GB & B"), asks this Court to reconsider our opinion in this case, reversing the trial court's summary judgment in favor of GB & B. GB & B argues that the summary judgment in its favor was proper because, according to GB & B, it owed no duty to Hannah. GB & B contends that the contract it entered into with Reynolds Metals Companyto convert the belt wrapper to its original overwind configurationdid not obligate GB & B to include safeguarding around the belt wrapper.[1]
*863 Significantly, GB & B asks this Court to consider the scope of GB & B's contract with Reynolds. However, GB & B failed to include that contract in the record on appeal. Four pages of a 19-page document generated on Reynolds's letterhead, describing "PROJECT NO. 549-Convert Recoilers to Overwind on Continuous Annealing Line (CAL), Bld. No. 214" does appear in the record. Although this document presumably describes the reconfiguration project, without the entire document we are unable to determine whether the document is a portion of the contract GB & B entered into with Reynolds or whether this document was simply a project description, used for Reynolds's own purposes. Even if it is a part of the contract it is obviously not the entire contract.
Moreover, the portion of the document before us refers to GB & B's obligation to comply with standards promulgated by the Occupational Safety and Health Administration ("OSHA"). OSHA required that barrier guards be placed in areas such as the area between the belt wrapper and the recoiler. GB & B argued on appeal that OSHA regulations apply only to employers. At this stage of the proceeding we cannot construe that reference to persons in an employment relationship with GB & B in the manner GB & B urges.
1002094APPLICATION OVERRULED.
MOORE, C.J., and HOUSTON, SEE, BROWN, JOHNSTONE, HARWOOD, WOODALL, and STUART, JJ., concur.
1002095APPLICATION OVERRULED.
MOORE, C.J., and HOUSTON, BROWN, JOHNSTONE, HARWOOD, and WOODALL, JJ., concur.
SEE and STUART, JJ., dissent.
NOTES
[1] Danieli and Hannah subsequently entered into a pro tanto settlement, resulting in Danieli's dismissal as a defendant.
[2] GB & B also argues that Jerry Hannah was contributorily negligent. GB & B and Westinghouse both make similar arguments regarding Hannah's alleged contributory negligence; therefore, we address those arguments together in Part V of this opinion.
[3] The record refers to a "National Ethical Code"; we assume that this is a reference to the Code of Ethics for Engineers promulgated by the National Society of Professional Engineers.
[4] Westinghouse also argues that Jerry Hannah was contributorily negligent. See note 2.
[1] The Alabama Branch of Associated General Contractors of America, Associated Builders & Contractors of Alabama, Inc., and Business Council of Alabama have submitted a brief as amici curiae in support of GB & B, making essentially the same argument GB & B makes. They argue that GB & B's contract did not obligate it to provide safeguarding around the belt wrapper.