I dissent because the plaintiff, Wilbert Jernigan, has not met his burden in proving a design defect. Under the Alabama Extended Manufacturer's Liability Doctrine ("the AEMLD"), the plaintiff bears the burden of proving the availability of an alternative design: *Page 675 
 "In order to prove that a product is defective for purposes of the AEMLD, a plaintiff must prove that
 "`"a safer, practical, alternative design was available to the manufacturer at the time it manufactured the [product]. The existence of a safer, practical, alternative design must be proved by showing that:
 "`"(a) The plaintiff's injuries would have been eliminated or in some way reduced by use of the alternative design; and that
 "`"(b) taking into consideration such factors as the intended use of the [product], its styling, cost, and desirability, its safety aspects, the foreseeability of the particular accident, the likelihood of injury, and the probable seriousness of the injury if that accident occurred, the obviousness of the defect, and the manufacturer's ability to eliminate the defect, the utility of the alternative design outweighed the utility of the design actually used."'
 "Beech v. Outboard Marine Corp., 584 So.2d 447, 450
(Ala. 1991) . . . (quoting General Motors Corp. v. Edwards, 482 So.2d 1176, 1191 (Ala. 1985), overruled on other grounds, Schwartz v. Volvo North America Corp., 554 So.2d 927 (Ala. 1989))."
Hannah v. Gregg, Bland Berry, Inc., 840 So.2d 839, 858 (Ala. 2002) (emphasis omitted). Thus, to recover in an action brought under the AEMLD, a plaintiff must prove that a "safer, practical, alternative design" was available that (a) would have reduced or eliminated the plaintiff's injuries and that (b) considering the factors alluded to above, the utility of the alternative design outweighs the utility of the design used.[23] Id.
In reviewing the trial court's judgment on GM's motion for a judgment as a matter of law, this Court must determine whether Jernigan, as the nonmovant, presented substantial evidence of the availability of a safer, practical, alternative design. Danielsv. East Alabama Paving, Inc., 740 So.2d 1033, 1037 (Ala. 1999) (citing Palm Harbor Homes, Inc. v. Crawford, 689 So.2d 3 (Ala. 1997)). Jernigan's expert, James Mundo, referred to the Ford Taurus automobile, the 2000 Pontiac Grand Prix automobile, and the first-generation H-car as "safer, practical, alternative designs" *Page 676 
to the second-generation H-car, which includes the Oldsmobile involved in the accident here. If Mundo ever considered the Ford Taurus as the embodiment of his alternative design, he abandoned it as such an alternative.[24] Thus, the 2000 Pontiac Grand Prix and the first-generation H-car must be examined to determine whether either qualifies as a "safer, practical, alterative design."
By definition, it would seem, the 2000 Pontiac Grand Prix could not be a safer, practical, alternative design for the 1993 Oldsmobile Delta 88 automobile because the plaintiff must show that the design used in the 2000 Pontiac Grand Prix was available in 1993 when GM produced the Oldsmobile Delta 88. Thus, without evidence supporting a finding that the Pontiac design was available to GM for manufacture when GM manufactured the Oldsmobile seven years earlier, the Pontiac cannot qualify as a "safer, practical, alternative design."
Jernigan fails to offer substantial evidence that the changes from the first-generation H-car to the second-generation H-car made the design of the second-generation H-car defective. There is no meaningful discussion of the utility of the first-generation H-car in comparison to the Oldsmobile. To determine the overall utility of the designs, factors such as the "styling, cost, and desirability [of the product], its safety aspects, the foreseeability of the particular accident, the likelihood of injury, and the probable seriousness of the injury if that accident occurred, the obviousness of the defect, and the manufacturer's ability to eliminate the defect." Hannah, 840 So.2d at 858. Jernigan presents evidence indicating only that certain design changes, among others, were made in the second-generation H-car that, considered in isolation from the other aspects of the overall design of the vehicle, contributed to Jeffrey's injury. Jernigan fails to show that these changes made the design of the second-generation H-car defective. Even if particular design aspects could, when considered in isolation, have been improved, it was incumbent upon Jernigan to demonstrate that there was available to GM a safer, practical, alternative design for the entire automobile. Nor is it sufficient simply to suggest that because certain elements of the design could have *Page 677 
been better, GM should have experimented to find a safer, practical, alternative design for the entire automobile. Beechv. Outboard Marine Corp., 584 So.2d 447, 450 (1991) ("We decline to hold, as a matter of law, that simply because `a feasible propeller guard could have been designed . . .' that an `alternative design' existed.").
An invitation to experiment does not meet the requirement of the AEMLD that "`the plaintiff must prove that a safer, practical, alternative design was available to the manufacturer at the time it manufactured the automobile.'" Beech, 584 So.2d at 450 (quoting General Motors Corp. v. Edwards,482 So.2d 1176, 1191 (Ala. 1985) (emphasis omitted)). Jernigan's expert, Mundo, testified that there were alternative designs available when the Oldsmobile was manufactured that would have kept the A-pillar in place in a frontal crash. However, Mundo failed to prove that those designs were in fact safer and practical when more than just the performance of the A-pillar was considered, namely, when the overall design, styling, and cost of the vehicle were considered.[25]
Because Jernigan has failed to meet his burden of proving the availability of a "safer, practical, alternative design," the trial court erred in denying GM's motion for a judgment as a matter of law. Therefore, because I would reverse the trial court's denial of GM's motion for a judgment as a matter of law, I respectfully dissent.
BROWN and STUART, JJ., concur.
[23] I understand this test to be one of the product, in this case an automobile. See Flemister v. General Motors Corp.,723 So.2d 25, 28 (Ala. 1998) (holding that the "vehicle was not defective, that is, that there was not a safer alternative design for the Flemister vehicle," where Flemister, the plaintiff, alleged only that the door hinge should have been a double-hung hinge instead of a single-hung hinge) (emphasis added). Thus, the test is whether a "safer, practical, alternative design" for the automobile is available; whether, "taking into consideration such factors as the intended use of the [product], its styling, cost, and desirability, its safety aspects, the foreseeability of the particular accident, the likelihood of injury, and the probable seriousness of the injury if that accident occurred, the obviousness of the defect, and the manufacturer's ability to eliminate the defect, the utility of the alternative design outweighed the utility of the design actually used." The main opinion apparently construes this test to apply only to the part of a product that fails; it states:
 "Jernigan's experts, however, did not consider the design changes in isolation. . . .
"`. . . .
 "` . . . All of those added together along with weakening the shotgun [beam], the whole thing just caved right on him.'
 "(Emphasis added.) [James] Mundo clearly based his opinion on the effect of the combination of the criticized design changes that he identified in the second-generation H-car, not on the effect of each design change in isolation."
883 So.2d at 665-66 (emphasis in main opinion).
[24] The main opinion argues that Jernigan never abandoned the Ford Taurus as a safer, practical, alternative design, first, because the evidence of such an abandonment was offered outside the presence of the jury, and, second, because GM's expert, Michael Holcomb, "could not, however, point to any statement in Mundo's deposition where Mundo himself testified that he relied exclusively on the Taurus as an alternative design." 883 So.2d at 667 n. 17. The main opinion continues:
 "Jernigan contends that Mundo never offered the Taurus as an embodiment of everything he recommended as an alternative design. . . . He stated in the presence of the jury during cross-examination that although he was involved in designing the Taurus when he worked for Ford Motor Company, he had `never praised the Ford Taurus as being the be all, end all.'"
883 So.2d at 667 n. 17. This is precisely the reason for my dissent; as I state below, Jernigan invites the jury to conclude that through proper experimentation GM could somehow have combined the Ford Taurus, the first-generation H-car, and the 2000 Pontiac Grand Prix to come up with the safer, practical, alternative design that Jernigan had the burden to present. Indeed, the main opinion also illustrates this approach when it defends the illustrative value of the 2000 Pontiac with respect to two features present in that vehicle:
 "To the contrary, Jernigan established that the torque boxes in the Pontiac were comparable to the torque boxes used in automobiles Mundo designed in the 1980s. The Pontiac also had the longer front lower rails Mundo had identified in the first-generation H-car and in the rear of the Oldsmobile."
883 So.2d at 667.
[25] Jernigan offered evidence indicating that the first-generation H-car design was less likely to cause serious head injury in a head-on collision, but the proper test is whether the entire alternative design is safer, not whether it reduces one type of injury. "Manufacturers are not insurers that `in every instance and under all circumstances no injury will result from the use' of their products." Owens v. Allis-ChalmersCorp., 414 Mich. 413, 431, 326 N.W.2d 372, 379 (1982) (quotingE.I. DuPont de Nemours Co. v. Baridon, 73 F.2d 26, 30 (8th Cir. 1934)). Nor do manufacturers have the luxury of selling each buyer a product specially designed for the type of accident that may befall that particular buyer.
Similarly, Jernigan's evidence that "these structural changes permitted changes in styling," was not a comparison of the commercial appeal of the alternative designs. The main opinion, however, is satisfied by evidence indicating that the first-generation H-car was a popular design and that "incorporation of Jernigan's safer, practical, alternative design would [not] produce an ugly duckling with the aesthetic appeal of an army tank." 883 So.2d at 668.